The TIMKEN COMPANY, Plaintiff,

v.

UNITED STATES, Malcolm Baldrige, Secretary of Commerce, Lionel H. Olmer, Under-Secretary for International Trade Administration, United States Department of Commerce, Larry Brady, Assistant Secretary for International Trade Administration, United States Department of Commerce, Gary N. Horlick, Deputy Assistant Secretary for Import Administration, United States Department of Commerce, Leonard M. Shambon, Director, Office of Compliance, International Trade Administration, United States Department of Commerce, John Kugelman, Director, Antidumping Order Compliance Division, International Trade Administration, United States Department of Commerce, J. Linnea Bucher, Compliance Officer, Antidumping Order Compliance Division, International Trade Administration, United States Department of Commerce, Defendants,

and

NTN Bearing Corporation of America, Intervenor.

Court No. 82–6–00890.

United States Court of International Trade.

Oct. 29, 1987.

• Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, and James R. Cannon, Jr., Washington, D.C., on the briefs), for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Dept. of Justice, Civ. Div., Commercial Litigation Branch, Washington, D.C. (Velta A. Melnbrencis, New York City, on the briefs), for defendants.

Barnes, Richardson & Colburn (James H. Lundquist, Robert E. Burke, Donald J. Unger, and Thomas M. Keating, Chicago, Ill., on the briefs), for intervenor.

*On Motions for Judgment on the Agency Record and for Remand Opinion and Order*

MALETZ, Senior Judge:

In 1982, the International Trade Administration of the Department of Commerce ("ITA" or "agency") issued a final determination revoking a dumping finding on tapered roller bearings and component parts ("TRBs") made in Japan by NTN Toyo Bearing Company ("NTN") and distributed by NTN's subsidiary, NTN Bearing Corporation of America ("NBCA"). Plaintiff, The Timken Company, an American manufacturer of TRBs, commenced the present action, challenging the ITA determination. Upon motion by the government, unopposed by Timken, the court remanded for further consideration by the ITA. The ITA's recalculation upon remand revealed only *de minimis* dumping margins. The case again came before the court on motion by Timken and, upon request of all parties, the court again remanded to the ITA. *Timken Co. v. United States*, 10 CIT —, 630 F.Supp. 1327 (1986). In its order of remand, the court directed the ITA to (1) collect and review additional home market sales data for the period of time that had previously been reviewed by the ITA, April 1, 1978 through November 14, 1978; (2) collect and review data for an additional period of time extending up to the date of the ITA's preliminary determination, February 27, 1981; (3) reassess proper TRB model comparisons; (4) review the accuracy of all pertinent NTN production costs; (5) correct all errors previously made; and

(6) recalculate dumping margins. 630 F.Supp. at 1350.

Upon remand, the ITA found a margin of 7.79 percent for NTN for the period April 1, 1978 through February 27, 1981, and so rescinded its earlier revocation of the dumping finding. *Final Results of Second Redetermination on Court Remand, The Timken Company v. United States,* Court No. 82–6–00890, at 38 (Jan. 28, 1987) (*"Second Redetermination"*). The case is again before the court, with all parties seeking yet another remand to the ITA. Timken, although approving the rescission of the revocation, argues that the agency made methodological and other errors. NBCA contends both that the agency made numerous errors and that it erred in rescinding. The government acknowledges that the ITA made certain errors in its calculations. Upon consideration of the entire record, the court concludes that another remand is necessary.

## 1. *Best Information*

The court, in its previous order, directed the ITA to collect additional home market sales data and cost of production data for April 1, 1978 through November 14, 1979 ("earlier period"), and for November 15, 1979 through February 27, 1981 ("later period"). 630 F.Supp. at 1332–41, 1350.[1] Upon remand, the ITA was advised that NTN had disposed of all its home market sales data for the earlier period, but had available home market sales data for the later period. United States sales data for both periods was already on the agency record or placed on the record. Cost of production data for neither period was available but was available for March 1, 1984 through September 30, 1984.[2]

Because NTN was unable to provide requested home market sales data for the earlier period and was unable to provide cost of production data for either period, the ITA relied on "best information available" to calculate dumping margins. *See* 19 U.S.C. § 1677e (1982 & Supp. III 1985); *Second Redetermination* 3, 13–16. It used as best information the home market sales data and United States sales data provided by NTN for the later period, November 15, 1979 through February 27, 1981, and the cost of production data for March 1 through September 30, 1984. Dumping margins calculated on the basis of this data were used as margins for the entire period under review. *See Second Redetermination* 3. The agency verified all information relied upon. Both NBCA and Timken contend that the ITA erred in its determination of what constituted best information.

### A. *NBCA's Contentions*

■■ NBCA asserts that the verified home market and United States sales data

1. Collection of additional home market data for the earlier period was necessary to enable the ITA to make a determination of what TRB models sold in the home market during that period were "such or similar" to those sold in the United States. The ITA had previously asked NTN to select the most similar home market models, and the administrative record therefore contained verified data only on identical and similar models selected by NTN. The court found that the ITA had abdicated its responsibility to itself select models to be compared, and so remanded for collection of complete home market data to permit the agency to make that selection. 630 F.Supp. at 1336–40. Collection of home market data for the later period was necessary to enable the ITA to review data up to the date of its preliminary determination, February 27, 1981. 630 F.Supp. at 1332–34; *Freeport Minerals Co. v. United States,* 776 F.2d 1029 (Fed.Cir.1985). The court also ordered review of all pertinent cost of production data for both periods. 630 F.Supp. at 1336 & n. 4, 1350.

2. The representations of NTN made in affidavits and briefs indicate that the data was disposed of in good faith and in the ordinary course of business, and the court will not on this record conclude that there was bad faith on the part of NTN. The court takes into consideration not only NTN's specific representations regarding the destruction of the documents, but also the fact that the information requested included data up to seven-and-a-half years old, previously requested portions of which had already been verified, and the fact that the information requested covered a period for which the ITA had originally issued a revocation. The procedural history of this case may, however, serve to alert potential respondents that even very old data pertaining to merchandise concerning which an antidumping order has been revoked, may yet end up being required in ITA proceedings.

for the earlier period that was already on the agency record should have been used as best information for that period.[3] However, a primary reason for the last remand was that the home market data for the earlier period, although verified, was so incomplete as to prevent the agency from making statutorily mandated determinations of what constituted "most similar" merchandise. *See* 630 F.Supp. at 1336–40. Had the ITA nonetheless relied upon that data on remand, it would have perpetuated the error the case was remanded to correct.[4] Nor did the ITA err in deciding not to use the complete United States sales data on the agency record for the earlier period. That decision was based on the reasonable conclusion that margins were best calculated by comparing contemporaneous data, rather than by comparing United States data with home market data from a later period. *See Second Redetermination* 16; *Matsushita Electrical Industrial Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984) (question is whether administrative conclusion is rational); *cf. Ceramica Regiomontana, S.A. v. United States*,

10 CIT ——, ——, 636 F.Supp. 961, 967 (1986) (where information provided by foreign government proved inaccurate in important respects ITA was under no obligation to use it), *aff'd*, 810 F.2d 1137 (Fed.Cir.1987).

### B. *Timken's Contentions*

■ Timken argues that the ITA should not have used *any* data provided by NTN as "best information." However, nothing in 19 U.S.C. § 1677e, requiring use of "best information," precludes reliance on a respondent's data. *See* 19 U.S.C. 1677e; *Budd Co. v. United States*, 1 CIT 67, 75, 507 F.Supp. 997, 1003–04 (1980) ("best information available" may include all information that is accessible or may be obtained, whatever its source). Moreover, the agency determinations cited by Timken merely establish that the agency has often relied on data other than a respondent's data; they do not establish, as Timken contends, that there is an agency policy of never relying on a respondent's data.[5] Indeed, ITA decisions indicate to the contrary that the agency has used verified respondents' data as best information.[6]

---

3. Additionally, NBCA argues that cost of production data from March 1 through September 30, 1984, although properly used as best information, should have been "deflated" to better approximate production costs for the period under review. *See infra*, at 501.

4. NBCA notes that part of the earlier period home market sales data on the agency record pertained to identical, rather than to similar, TRB models. It contends that that data, at least, should have been used as best information, because no determination of "similarity," and therefore no additional home market sales data, was necessary regarding identical models. The ITA has concluded, however, that it is not possible to ascertain whether the data in the agency record regarding identical models reflects *all* home market sales of those models. Since the agency could no longer verify that in fact all relevant data on the identical models had been submitted, the agency acted reasonably in declining to use that data as best information.

5. Timken's reliance on *Large Power Transformers from Italy*, 49 Fed.Reg. 31,313 (Dep't Comm. 1984) (final results of admin. review), and on the opinion reviewing that decision, *Ansaldo Componenti, S.p.A. v. United States*, 10 CIT ——, 628 F.Supp. 198 (1986), is misplaced. A primary factor in both the agency's and the court's decisions in that case was the persistent untime-

liness of the respondent in providing any responses at all to the agency. *See* 49 Fed.Reg. at 31,314; 628 F.Supp. at 205–06. Additionally, that case did not present a situation in which complete and verified sales data covering a lengthy period of time had been made available by the respondent, as is the case here.

6. *See, e.g., Certain Stainless Steel Sheet and Strip Products from Spain*, 49 Fed.Reg. 35,538, 35,-538–39 (Dep't Comm.1984) (final determination) (agency used best information to determine starting prices in both markets but used verified data from respondent for items including ocean freight rate, transportation, handling and brokerage); *Industrial Nitrocellulose from France*, 48 Fed.Reg. 21,615, 21,617 (Dep't Comm.1983) (final determination) (where requested profit and loss statement for specific product not provided because not maintained by respondent, other detailed data provided by respondent used by ITA); *cf. Certain Electric Motors from Japan*, 52 Fed.Reg. 1,216, 1,216–17 (Dep't Comm.1987) (prelim. results) (in preliminary review, ITA used the complete portions of response as the best information available for the incomplete portions of response; for period for which no information supplied, ITA relied on most recent assessment rate for the firm); *Certain Steel Products from France*, 47 Fed.Reg. 35,656, 35,-658–59 (Dep't Comm.1982) (prelim. determination) (if certain requested information not re-

■ The ITA was therefore not barred from using NTN's data as best information nor did it abuse its discretion in relying on that data. Timken argues that in any event better sources of information were: (1) a market research report Timken had submitted; (2) certain information on home market sales contained in "Section A" of NTN's original questionnaire response; or (3) the highest dumping margin of another respondent. However, the ITA not unreasonably concluded that Timken's market research report was unreliable[7] and that use of the Section A information would have been inappropriate because it contained only aggregate figures reflecting sales of merchandise which were not all of the same general class or kind as the merchandise under review. *See Second Redetermination* 14–16. With regard to Timken's contention that the ITA should have used the highest dumping rate of another respondent, the record shows that the ITA was under the impression that no specific dumping rate was available, *id.* at 15; Timken did not bring the existence of such a rate to the agency's attention. Timken therefore acts too late in only now bringing the existence of an applicable rate to the agency's and the court's attention. *See United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) (courts should not topple over administrative decisions unless administrative body not only erred but erred against objection made at time appropriate under its practice). Moreover, the ITA's selection of best information was a reasonable exercise of its discretion. *See Matsushita Electric Industrial Co., supra,* 750 F.2d at 933.

### 2. Deflation of Production Costs

■ Because production cost data for the period under review was not available, the ITA used production cost data from 1984. NBCA argued that those 1984 costs should be deflated to more closely approximate actual costs from 1978 through 1981. The agency refused to use the suggested deflation ratios on the ground that it could not verify their applicability to NTN's own experience. *Second Redetermination* 32–33. This was reasonable particularly since NTN could provide no cost document that would have enabled the agency to ascertain that inflation rates in Japan had indeed been reflected in NTN's actual costs.

### 3. Authority to Rescind

■ The Second Redetermination states:

*Under section 776(a) of the Tariff Act of 1930, as amended ... and the Department's practice, the Department must verify all information relied on in making a revocation.... Since the data from this period are necessary for an affirmative determination to revoke, and since those data are unavailable for review and verification, the Department is rescinding the partial revocation.*

*Second Redetermination* 2 (emphasis added). NBCA asserts that the ITA improperly relied upon section 776(a), which provides that the ITA shall verify all information it relies upon in revoking an antidumping duty order.[8] Tariff Act of 1930, § 776(a), *as amended by* the Trade Agreements Act of 1979, 19 U.S.C. § 1677e(a) (Supp. III 1985). The portion of section 776 so providing did not become effective until 1984. Pub.L. 98–573, tit. VI, § 626(a), 98 Stat. 3042 (1984), 19 U.S.C. § 1671 note (Supp. III 1985) (amended 1986). NBCA

ceived from respondents, agency might use none or "only some" of the partial information received); *Certain Steel Products From the Federal Republic of Germany,* 47 Fed.Reg. 35,650, 35,654–55 (Dep't Comm.1982) (prelim. determination) (same).

**7.** Timken complains that the agency should have alerted it during the last remand to the perceived unreliability of the report so that it could have remedied the problem. However, Timken was fully aware of the agency's position

regarding the report and had thoroughly canvassed that issue in memoranda filed with the court on the previous appeal.

**8.** Another argument made by NBCA is that by rescinding the revocation, the agency overstepped the bounds of the judicial mandate on the last remand. Given that the remand order directed recalculation of dumping margins by the agency, and that the agency then found more than *de minimis* dumping margins, this argument is without merit.

contends that only those verification requirements in effect as of 1982, when the dumping order was revoked, should have been relied upon, and claims that the ITA's reliance on section 776(a) therefore gave that section an improper retroactive effect.

The court need not determine whether section 776 has retroactive effect because verification was required in 1982 as well as in 1984. The 1982 revocation was made during a section 751 annual review proceeding; verification was required in such proceedings. 19 U.S.C. § 1677e(a) (1982), *amended by* 19 U.S.C. 1677e(a) (Supp. III 1985); Tariff Act of 1930, § 751, *as amended by* the Trade Agreements Act of 1979, 19 U.S.C. § 1675 (1982), *amended by* 19 U.S.C.A. § 1675 (West Supp.1987); *Al Tech Specialty Steel Corp. v. United States,* 745 F.2d 632 (Fed.Cir.1984) (section 1677e(a) requires verification in section 751 proceedings).[9] Consequently, even assuming, *arguendo,* that the ITA erred in relying on section 776(a), that error did not affect NBCA's substantive rights.

### 4. *Use of Similar Merchandise*

Both Timken and NBCA object to the methodology that the ITA used to determine what constituted "such or similar" merchandise. Timken argues that the ITA's reliance on "dynamic load rating" as a criterion for selecting similar merchandise was unreasonable and that the agency should have relied instead on "system life." NBCA argues that the ITA acted improperly in treating "special feature" bearings sold in the home market as "similar" merchandise.

### A. *Dynamic Load Rating—System Life*

■ Before establishing the criteria for choosing similar merchandise, the ITA held discussions with both Timken and NBCA. Subsequently, it settled on three characteristics significant to model matching of TRBs: (1) inside diameter; (2) outside diameter; and (3) dynamic load rating. *Sec-*

*ond Redetermination* 10. Dynamic load rating is the number of hours of performance that can be expected from a given bearing under a standard number of revolutions per hour. It is a function of such bearing features as width, number of rollers, length of rollers, angle of rollers, and metallurgical content. *Id.* at 11.

Timken contends that system life would have been a better third criterion, arguing, *inter alia,* that bearings which have similar dynamic load ratings can have vastly different system lives and that system life, not dynamic load rating, is the criterion most relied upon by customers. The government acknowledges that system life might have been a reasonable method for determining similarity but argues that: (1) use of dynamic load rating was also reasonable; (2) the agency's initial decision to use dynamic load rating was based in part on the fact that Timken itself had appeared to equate dynamic load rating with system life; and (3) Timken did not bring system life to the agency's attention in a sufficiently timely manner to permit it to take system life into account, and failed to provide the ITA with sufficient information on system life.

The question before the court is not whether system life would have been a reasonable criterion for determining similarity but rather whether the ITA's reliance on dynamic load rating was reasonable. The court finds that it was. *See Melamine Chemicals, Inc. v. United States,* 732 F.2d 924, 928 (Fed.Cir.1984) (agency's interpretation of statute sustained unless unreasonable). As noted, dynamic load rating is a function of a number of significant bearing features. Also, it is a standard rating within the industry and NTN could be expected to maintain model-by-model data regarding it. What is more, on the facts of this case, it appears that Timken acted untimely in bringing its contentions to the agency's attention.

---

**9.** Verification in section 751 proceedings is now necessary only in certain circumstances. *See* 19 U.S.C. § 1677e(a)(3) (Supp. III 1985).

## B. *"Special Feature" Bearings*

█ NBCA contends that the ITA, in determining what constituted "similar merchandise," failed to consider one of the statutorily required factors, namely "commercial value." 19 U.S.C. § 1677(16) (1982).[10] It argues that certain "special feature" bearings should not have been considered similar to bearings sold in the United States because they were different in, among other things, commercial value.

The relevant statute provides that to be deemed "similar," merchandise must be produced in the same country as the subject merchandise; be like the subject merchandise in component materials and in the purposes for which used; and be *"approximately equal in commercial value"* to that merchandise. 19 U.S.C. § 1677(16) (emphasis added). As noted, the ITA used inside diameter, outside diameter, and dynamic load rating as its three criteria for determining similarity, with dynamic load rating reflecting a number of other significant characteristics. The Second Redetermination does *not* indicate that "commercial value" was among the factors considered.

It may be that the agency considered commercial value to be a function of the criteria that it specifically enumerated, so that a finding of approximately equal commercial value is implicit in the ITA's determination of similarity. However, the court cannot determine from the record whether the agency did in fact consider commercial value. The case is therefore remanded for a determination of whether merchandise compared was of approximately equal commercial value.

NBCA further alleges that the ITA improperly placed a burden on it to establish that its special feature bearings did *not* constitute similar merchandise, thereby abdicating the agency's responsibility to itself determine similarity or lack of similarity.[11] The court cannot agree that the ITA placed an improper burden on NBCA. The agency had made an initial and reasoned determination of what constituted similar merchandise.[12] Having made that determination, it was not then improper for the ITA to require a party contesting its chosen method to present evidence in support of its contentions. *Cf.* Administrative Procedure Act, 5 U.S.C. § 556(d) (1982); *Environmental Defense Fund, Inc. v. E.P.A.,* 548 F.2d 998, 1013–18 (D.C.Cir.1976) (proponent of a rule or order or the denial thereof has burden of coming forward with evidence), *cert. denied,* 431 U.S. 925, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977).

## 5. *Level of Trade*

█ On the last remand the ITA selected what constituted most similar merchandise for purposes of comparison with merchandise sold in the United States. In doing so, it did not intend, in determining similarity, to consider the level of trade at which the

---

10. This section, 19 U.S.C. § 1677 (1982), was enacted as part of the Trade Agreements Act of 1979 ("1979 Act"). The 1979 Act repealed the 1921 Act. *See* 1979 Act, Pub.L. No. 96–39, tit. 1, § 106, 93 Stat. 193. However, the provisions of not only the 1979 Act but also of the Antidumping Act of 1921 ("1921 Act"), ch. 14, tit. II, 42 Stat. 11, are here applicable, in view of the ITA's review of TRB entries occurring both before and after January 1980. *See* 1979 Act, Pub.L. No. 96–39, tit. 1, §§ 106–107, 93 Stat. 193. The 1921 Act was in large part reenacted by the 1979 Act, *see* H.R.Rep. No. 317, 96th Cong., 1st Sess. 59 (1979), U.S.Code Cong. & Admin.News 1979, p. 381, and contained an equivalent definition of similar merchandise. 1921 Act, § 212(3), *as amended* . (previously codified at 19 U.S.C. § 170a(3) (1976)). The court will specifically discuss the provisions of the 1921 Act only when discussion is necessitated by the arguments of the parties. References to the 1921 Act will be to the volume of the United States Code in which they formerly appeared.

11. In its Second Redetermination, the ITA stated:

> We requested NTN to justify claimed exclusions of special feature bearings. Except with regard to double row bearings, NTN discussed only the general nature of the differences between special feature bearings and other bearings, and provided no examples to demonstrate that these bearings were so different from other bearings in physical characteristics, production costs, or uses to justify their exclusion from consideration as similar merchandise.

*Second Redetermination* 31.

12. With the caveat that it may not have considered "commercial value." *See supra,* at 502 –03.

merchandise had been sold, but rather intended to later make appropriate adjustments for any differences in level of trade. However, a computer error caused level of trade to in fact be considered as a factor in the agency's determination of similarity. The government and Timken both ask that the case be remanded for correction of this computer error. NBCA argues against such a remand, contending that level of trade is indeed a relevant factor in a determination of similarity. According to NBCA, sales of home market merchandise at a level of trade different from that at which United States merchandise is sold may reflect differences in "commercial value" such that the merchandise may not be considered similar. *See* 19 U.S.C. § 1677(16); 19 C.F.R. § 353.19.

■ The ITA's decision not to consider level of trade in ascertaining similarity was reasonable. Nothing in the statute setting forth the criteria to be considered by the agency in determining similarity indicates that level of trade is a relevant, much less a determinative, factor. *See* 19 U.S.C. § 1677b(a)(1)(A) (Supp. III 1985); *id.* § 1677(16) (1982).[13] However, since the computer error undermined the agency's methodology on this score, the case is remanded for correction of the error after which the ITA will make any necessary allowance for differences in level of trade.

6. *Splitting of Sets*

A. *NBCA's Contentions*

■ Each TRB possesses a cup and a cone. In the United States market, NBCA sells some cups and cones separately and some in sets. In the home market, however, the bulk of TRB models are sold in sets. Because of this, when the ITA sought to compare the prices of cups and

cones sold separately in the United States with prices of "such or similar" home market cups and cones, it found in a number of instances that such or similar models had been sold in the home market only in sets. The agency then compared prices of the cups or cones sold separately in the United States with the prices of cups or cones sold in sets in the home market by prorating the value of sets according to the relative production costs of the component cup and cone.[14] *Second Redetermination* 7-8.

NBCA contends that by treating home market sales of sets as sales of individual cups and cones for purposes of establishing a home market price, the ITA failed to follow the guidelines contained in 19 U.S.C. § 1677b(a)(1)(B):

> In the ascertainment of foreign market value for the purposes of this subtitle no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

19 U.S.C. § 1677b(a)(1)(B) (1982).[15] In effect, NBCA argues that there is no "price" for either a cup or a once sold as part of a set, but only a "price" for the set as a whole. Consequently, says NBCA, the ITA, by assigning prices to individual cups and cones based on relative production costs, created "pretended sale(s)" and "sale(s) ... intended to establish a fictitious market," in violation of the statute. According to NBCA, there are no home market sales of individual cups or cones at any non-pretended price, and the ITA therefore should have used constructed value for all home market sales. *See* 19 U.S. C. § 1677b(e) (1982 & Supp. III 1985).

NBCA is incorrect in asserting that by splitting sets the ITA used "pretended sale(s)" to determine foreign market value. The sales of the cups and cones in the

---

**13.** It is conceivable, of course, that if home market and United States sales of merchandise were consistently made at different levels of trade that would be some indication that the sales were not of similar merchandise. However, not only is there no indication that that is the case here, the effect of the ITA's computer error was to make level of trade a key factor in the agency's determination of similarity.

**14.** In determining the relative production costs of cups and cones, the ITA made adjustments to standard costs for actual cost variances attributable to differences in production runs geared toward sets.

**15.** The equivalent provision of the 1921 Act is section 205(a), *as amended*, 19 U.S.C. § 164(a) (1976).

home market were not pretended; they were legitimate sales to legitimate customers that actually took place. Nor can section 1677b(a)(1)(B) reasonably be interpreted as preventing the ITA from determining prices of home market merchandise whenever that merchandise was sold together with other merchandise for a single price. That section appears intended to prevent foreign manufacturers from using misleading invoices or other practices to circumvent the anti-dumping law. *See* H.R.Conf. Rep. No. 79, 67th Cong., 1st Sess. 11 (1921) (purpose of section is to prevent the establishment of a fictitious market value by other than bona fide sales). Not only does the ITA's interpretation, permitting it to split sets, not permit such circumvention, it discourages it. In the absence of the agency's practice of splitting sets and determining prices based on relative production costs, NTN could have compelled use of constructed value simply by selling sets in one market and single cups and cones in the other. *See Certain Electric Motors from Japan*, 49 Fed.Reg. 32,627, 32,628–29 (Dep't Comm.1984) (final admin. review) (ITA chose system sales as the basis for comparison to prevent the possibility of disguised margins). The court declines to read section 1677b(a)(1) to permit such control by foreign manufacturers of the manner in which foreign market value is determined.

NBCA argues in the alternative that if the ITA's splitting of sets was lawful, the ITA should have combined sales prices of the cups and cones sold individually in the home market to determine a weighted average foreign market value for sets. The ITA responds that it was willing to aggregate prices in this fashion but could not do so because NBCA did not supply a list of models to be aggregated. The court has reviewed the administrative record and finds that the ITA requested the necessary information and that NBCA neither provided it nor requested additional time to do so. Consequently, NBCA cannot now complain

of the ITA's failure to aggregate the prices of individual cups and cones.

### B. Timken's Contentions

Timken supports the ITA's practice of splitting sets, but challenges aspects of the ITA's actual calculations. The government responds that the agency is in the process of ascertaining whether the errors alleged by Timken in fact occurred and asks for a remand to permit it to correct any such errors if they occurred. Consequently, the court directs the ITA to consider upon remand the allegations of error made by Timken in sections IV. A. and IV. B. of its confidential brief, pp. 38–46.

### 7. Usual Commercial Quantities

■ NBCA argues that certain of the home market sales used by the agency in calculating foreign market value were not "in the usual commercial quantities" or "in the ordinary course of trade." *See* 19 U.S. C. §§ 1677b(a)(1)(A), 1677(17) (Supp. III 1985); *id.* § 1677(15) (1982).[16] The agency had declined to consider NBCA's arguments on the ground that they were untimely raised. The basis for the agency's conclusion was its understanding, persisting up to the time of oral argument, that the questionnaire sent by the agency to NTN had included a question on whether any of NTN's home market sales were not in the usual commercial quantities. In the agency's view, NTN's silence on this point had permitted a conclusion that all sales were indeed in the usual quantities. *Second Redetermination* 37; Government memorandum 28; Transcript of oral argument 58. In fact, as the government conceded during oral argument, the questionnaire included no such question. Transcript of oral argument 78–80. Because the agency's conclusion that NBCA's arguments were untimely was based on an incorrect assumption, the case is remanded for consideration of NBCA's contentions regarding usual commercial quantities andordinary course of trade.

**16.** Equivalent 1921 Act provisions are sections 205 and 212(2), (4), *as amended,* 19 U.S.C. §§ 164, 170a(2), (4) (1976).

8. *Constructed Value and ESP Offset*

■ Under Section 773 of the Tariff Act of 1930, as amended by the 1979 Act, 19 U.S.C. § 1677b(a), the foreign market value of imported merchandise may be established in one of three ways: (1) on the basis of sales data of such or similar merchandise sold in the home market; (2) on the basis of sales data of such or similar merchandise sold in a third country; or (3) on the basis of constructed value. 19 U.S. C. § 1677b(a). Constructed value consists of the cost of materials, the cost of fabrication or processing, general expenses, a reasonable profit, and the cost of packing and readying the merchandise for shipment to the United States. 19 U.S.C. § 1677b(e). The ITA determined that for various TRB models sold in the home market the appropriate basis for determining foreign market value was constructed value.

However it is calculated, foreign market value is compared with United States price for purposes of calculating dumping margins. United States price, in turn, may be calculated in two ways, either as "purchase price," or as "exporter's sales price" ("ESP"). 19 U.S.C. § 1677a (1982 & Supp. III 1985). The antidumping law provides that certain adjustments be made both to United States price and foreign market value for the purpose of accurately comparing their values to determine if there are margins. *See* 19 U.S.C. §§ 1677a(d), (e), 1677b(a). 19 U.S.C. § 1677b(a)(4)(B) requires that foreign market value be adjusted for "differences in circumstances of

sale" ("differences"). *Id.* at § 1677b(a)(4)(B). The ITA has interpreted the "differences" section to permit the so-called "ESP offset," which is set forth in section 353.15 of its regulations. 19 C.F.R. § 353.15 (1986).[17] Timken argues that the "differences" adjustment is not applicable when foreign market value is based on constructed value and, more specifically, that the ESP offset is not applicable.[18]

Under the Antidumping Act of 1921, constructed value was not, technically, within the definition of "foreign market value." Rather, the definition of constructed value was set forth in a separate statutory section that did not provide for a "differences" adjustment. *See* 1921 Act, *as amended by* Pub.L. No. 85–630, § 3, 72 Stat. 584–85 (1958), 19 U.S.C. § 165 (1976). Under the 1979 Act, which repealed the 1921 Act, the definition of "foreign market value" was changed to include constructed value as well as price-based value, and all the methods for determining foreign market value were set forth in section 773, entitled "foreign market value." 19 U.S.C. § 1677b. Specifically, in subsection (a)(2) of section 773, the statute provides that in the event foreign market value cannot be determined by price, "the foreign market value of the merchandise may be the constructed value of that merchandise." 19 U.S.C. § 1677b(a)(2). The method of determining constructed value is then set forth in subsection (e). Subsection (a)(4) of section 773 requires the agency to make adjustments to "foreign market value" for "differences in circumstances of sale." 19 U.S.C.

17. The regulation provides, *inter alia:* "In making comparisons using exporter's sales price, reasonable allowance will be made for all actual selling expenses incurred in the home market up to the amount of selling expenses incurred in the United States market." 19 C.F.R. § 353.15.

18. The ESP offset is designed to adjust foreign market value so that prices in the home and foreign markets can be more fairly compared. 19 U.S.C. § 1677a(e)(2) (1982) requires that ESP be adjusted for "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." This requires deduction from ESP of indirect selling expenses. *See Smith Corona Group, Consumer Products Division, SCM Corp. v. United States,* 713 F.2d 1568, 1577–78 (Fed.Cir.1983), *cert. denied,* 465 U.S.

1022, 104 S.Ct.1274, 79 L.Ed.2d 679 (1984). Such deductions from ESP increase the dumping margin. To counterbalance the adjustment to ESP, the ITA deducts indirect selling expenses incurred in the home market from foreign market value "up to the amount of the selling expenses incurred in the United States market." 19 C.F.R. § 353.15(c). In *Smith Corona Group, supra,* the ESP offset regulation was challenged and upheld on the ground that the offset "is a proper and reasonable exercise of the Secretary's authority to administer the statute fairly." 713 F.2d at 1579. *Smith Corona Group* did not, however, address the specific question of whether or not the ESP offset applies when foreign market value is established on the basis of constructed value.

§ 1677b(a)(4). Because foreign market value is defined to include constructed value, the "differences" adjustment, by the literal language of the statute, must be applied to constructed value as well as to price-based foreign market value.

Timken argues that despite this literal language, Congress did not intend the agency to make the "differences" adjustment—including the ESP offset—when constructed value is being used as foreign market value. Timken relies in part upon the legislative history of the 1979 Act which indicates that Congress's inclusion of "constructed value" in the foreign market value section was "not substantive and is intended solely to simplify the law." S.Rep. No. 249, 96th Cong., 1st Sess. 95, *reprinted in* 1979 U.S.Code Cong. & Ad. News 381, 481 ("S.Rep. No. 249").

As a general rule, the literal language of a statute will control, absent clear conflicting legislative intent. *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164, 105 S.Ct. 638, 645, 83 L.Ed.2d 556 (1985) (when there is conflict between statute's literal language and its legislative history, court assumes that the ordinary meaning of the language Congress employed accurately expresses the legislative purpose); *Escondido Mutual Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984) (absent a clearly expressed legislative intention to the contrary, literal language controls); *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). Timken argues that the literal statutory language—under which the adjustment for differences in circumstances of sale is applicable to constructed value—conflicts with legislative intent that there be no substantive change in existing law. It relies on the fact that prior to 1979, there was no clear statutory provision for an adjustment to constructed value for differences in circumstances of sale, and argues that to read the 1979 Act to include such an adjustment is to read the Act as having effected a "substantive change" in the law.

The court cannot agree that the legislative history indicating that the 1979 Act made no "substantive change" necessarily indicates a congressional intent that the "differences" adjustment not apply to constructed value. The ITA had interpreted the *1921* Act to permit an adjustment to constructed value for differences in circumstances of sale, and had applied the ESP offset to constructed value.[19] 19 C.F.R. 153.10 (1979), 41 Fed.Reg. 26,204 (1976). Consequently, Congress may have understood the 1921 Act as permitting that adjustment. If so, Congress's expressed intent that no substantive change be effected by the 1979 Act's inclusion of constructed value in "foreign market value," section 773, does not necessarily indicate that Congress did not intend the "differences" adjustment to apply to constructed value. *Cf.* S.Rep. No. 249, at 107, *reprinted in* 1979 U.S.Code Cong. & Ad.News 493 (administrative and judicial precedents regarding 1921 act to apply under 1979 Act). Moreover, both the 1921 Act and the 1979 Act must be read to allow for a "differences" adjustment if there is not to be an

---

**19.** As of 1976, an ITA regulation provided that adjustments for differences in circumstances of sale are to be made when "comparing the United States price with the sales, *or other criteria applicable,* on which a determination of foreign market value is to be based...." 19 C.F.R. § 353.15(a) (emphasis added). Under that regulation, one of the differences for which adjustment was to be made was the "ESP offset." *See* 19 C.F.R. § 153.10 (1976), 41 Fed.Reg. 26,204 (1976). The current section 353.15(a) of the ITA regulations also provides for differences in circumstances of sale adjustments when foreign market value is determined on the basis of constructed value. *See Cellular Mobile Telephones and Subassemblies from Japan,* 50 Fed.Reg. 45,-447, 45,458 (Dep't Comm.1985) (final determination); *Spun Acrylic Yarn from Italy,* 50 Fed.Reg. 35,849, 35,850 (Dep't Comm.1985) (final admin. review); *Certain Electric Motors from Japan,* 49 Fed.Reg. 32,627, 32,631 (Dep't Comm.1984) (final admin. review). In *Consumer Products Division, SCM Corp. v. Silver Reed America, Inc.,* the Federal Circuit noted that the adjustments to both ESP and foreign market value for indirect expenses were made by the agency first as a matter of practice and then set forth in regulations in 1976. 753 F.2d 1033, 1038 (Fed.Cir. 1985).

absurd result.[20] *See Crooks v. Harrelson,* 282 U.S. 55, 59–60, 51 S.Ct. 49, 50–51, 75 L.Ed. 156 (1930). Consequently, the court upholds the ITA's practice of making adjustments to constructed value for differences in circumstances of sale.

*Statutory Scheme*

The definition of constructed value requires the inclusion of "general expenses," 19 U.S.C. § 1677b(e)(1)(B), which the ITA understands to include selling expenses. According to Timken, it is illogical for the agency to *deduct* selling expenses from constructed value under the ESP offset, because it has *added* selling expenses in order to make an initial computation of constructed value.[21] A subsequent offset adjustment to this constructed value is not, however, inconsistent with the statutory objective, which is to establish a proxy for price-based foreign market value. The offset is simply a device to enable the agency to fairly compare the foreign market value of imported merchandise with the United States price, which has been reduced in accordance with the requirements of section 772(e), 19 U.S.C. § 1677a(e)(2).

The section defining constructed value refers to the "constructed value of *imported merchandise.*" 19 U.S.C. § 1677b(e)(1) (emphasis added). Timken contends that this reference to "imported merchandise" indicates that the value to be calculated is the value of merchandise already "imported" into the United States, and so is a value that *already* represents the value of United States merchandise, without need for further adjustment. This contention is without merit since the very same reference to "imported merchandise" also appears in the subsection pertaining to price-based foreign market value, as to which the "differences" adjustment is clearly applicable. *See* 19 U.S.C. § 1677b(a)(1).

Timken's remaining argument is that constructed value does not relate to specific sales, so that it is illogical to deduct an amount, such as the offset, which is related to specific sales. However, the statutory objective, regardless of the method used to determine foreign market value, is to establish the *value* of certain goods; fairness may require a deduction from that value, and does require such a deduction in the

**20.** Assume, for example, a foreign market *price-based* value of $200 and a United States purchase price of $500, of which $400 is attributable to direct selling expenses uniquely associated with United States sales, *e.g.,* advertising expenses. Assume no direct selling expenses in the home market. Under the differences in circumstances of sale provision, $400 would be added by the agency to foreign market value, resulting in a dumping margin of $100. *See Hearings before the Senate Committee on Finance on H.R. 6006, An Act to Amend Certain Provisions of the Antidumping Act, 1921,* 85th Cong., 2d Sess. 19 (1958) (*Explanatory Memorandum of the Treasury Department for the Senate Finance Committee,* submitted by A. Gilmore Flues, Assistant Secretary of the Treasury) (quoted *infra,* at p. 512 n. 30). Assume now that *constructed* value rather than price-based value had been used as foreign market value. The result would be different under Timken's interpretation of the statute. According to Timken, the differences provision of 19 U.S.C. § 1677b(a)(4) does not apply when constructed value is used as foreign market value. Consequently, were Timken's argument to be followed to its logical conclusion, no adjustment would be made by the agency to constructed value to account for the $400 in direct United States advertising expenses, and no dumping margin would be found. However, constructed value is

merely a proxy for price-based value, used by the agency when price-based value is not available, and the financial return to the foreign manufacturer from the United States sales would be the same, regardless of how foreign market value had been calculated. It would be totally illogical to permit foreign manufacturers to engage in United States pricing behavior that would otherwise constitute dumping, simply because a price-based foreign market value is not available (as might be the case if, *e.g.,* foreign market sales had to be disregarded by the agency because they were below cost).

**21.** Timken also asserts that applying the offset to constructed value may reduce the amount of included general expenses below the statutorily required minimum of ten percent, 19 U.S.C. § 1677b(e), again nullifying the intent of Congress. The obligation to make adjustments does not undermine the ten percent general expenses minimum. One prong of the statute functions to establish the value and another prong, here, the ESP offset, functions to adjust it for comparison. Under Timken's view, any statutory adjustment which in some manner modifies an initial value determination could be considered as undermining the statutory scheme. Congress, however, developed the present system to best achieve values positioned for fair comparison.

case of the ESP offset. *Smith–Corona Group, Consumer Products Division, SCM Corp. v. United States,* 713 F.2d 1568, 1579 (Fed.Cir.1983). Without that deduction foreign market value would be unfairly weighted and lead to an inequitable result.

### 9. *ESP Offset*

 When the ITA deducted selling expenses from foreign market value under the ESP offset, it calculated the adjustment on the basis of the absolute dollar amount of indirect expenses in the United States market, thus deducting from foreign market value the same dollar amount that had been deducted from ESP under 19 U.S. C. § 1677a(e)(2). NBCA claims that the agency should have based its ESP offset adjustment on the *percentage* of selling expenses in the United States market, and deducted a similar percentage for home market selling expenses. The ITA responds that the regulation under which the ESP offset is administered, 19 C.F.R. § 353.15(c) (1986), requires that circumstance-of-sale adjustments can be made up to the actual "amount" of selling expenses incurred in the home market. Since NBCA acknowledges that the regulation makes no reference to percentages, the dispute turns on the meaning of the word "amount."

The word "amount" appears extensively throughout the regulation pertaining to adjustments to ESP. *See, e.g.,* 19 C.F.R. § 353.10(d) (1986). NBCA asserts that all of these adjustments are made by the ITA on a percentage and not on an absolute basis. The ITA, in contrast, states that its practice is to make all adjustments on the basis of actual expenses, if the necessary data is available.

In construing administrative regulations, the agency's interpretation is controlling unless it is plainly erroneous or inconsistent with the regulation. *United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977). Here,

the Commerce Department drafted the regulation in dispute and understands that regulation to require adjustment by absolute dollar amounts rather than percentages. The court does not find this an improper exercise of agency authority. As such, the court holds that the ITA did not improperly calculate the ESP offset cap, limiting deductions from foreign market value to actual selling expenses incurred in the home market.

### 10. *Foreign Market Value: Differences in Circumstances of Sale*

The ITA treats direct selling expenses as "differences in circumstances of sale" under 19 U.S.C. § 1677b(a)(4), which provides:

*In determining foreign market value, if it is established* to the satisfaction of the administering authority *that the amount of any difference between the United States price and the foreign market value* (or that the fact that the United States price is the same as the foreign market value) *is wholly or partly due to—*

\* \* \* \* \* \*

(B) other *differences in circumstances of sale ...*

\* \* \* \* \* \*

then due allowance shall be made therefore.

19 U.S.C. § 1677b(a)(4) (emphasis added).[22] Under agency practice, if purchase price is being used as United States price,[23] the agency will adjust foreign market value for the net amount of differences in circumstances of sale in the home and United States markets. In effect, if direct selling expenses are uniquely associated with the circumstances of *home market* sales, the ITA will adjust foreign market value downward by the amount of those expenses; if direct selling expenses are uniquely associated with the circumstances of *United States* sales, the ITA will adjust foreign market value upward by that amount, *if* it is using purchase price as United States

---

**22.** The equivalent 1921 Act section is section 202(b)(2), (c)(2), *as amended,* 19 U.S.C. § 161(b)(2), (c)(2) (1976).

**23.** There are two types of United States price: purchase price and exporter's sales price ("ESP"). 19 U.S.C. § 1677a.

price.[24] *See* U.S. Dep't of Commerce, *Study of Antidumping Adjustments Methodology and Recommendations for Statutory Change* 19–20 (1985).[25] If the agency is using ESP rather than purchase price, it makes the adjustment for direct selling expenses attributable to United States sales, *not* to foreign market value, but to ESP. *See id.* at 20 n. 10, 42 (in ESP situations, agency subtracts the unique costs associated with the United States goods from ESP rather than adding them to the foreign market price). It is this practice which NBCA vigorously contests. For instance, if there are direct selling costs of $100 in the United States, the agency will adjust ESP downward by that amount, rather than adjusting foreign market value upward. In the present case, the ITA used ESP as United States price, and so reduced ESP by direct selling expenses attributable to United States sales. The agency apparently makes this adjustment pursuant to the differences in circumstances of sale provision of section 1677b(a)(4), quoted above. However, this is not entirely clear from the present record; it is possible that the ITA makes this adjustment to

ESP under 19 U.S.C. § 1677a(e)(2), which provides for deduction from ESP of "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." [26]

NBCA argues that: (1) direct selling expenses, whether attributable to home market or to United States sales, should be treated as "differences in circumstances of sale" under section 1677b(a)(4)(B), not as "expenses generally incurred" under section 1677a(e)(2); and (2) those differences should be taken into account in the agency's determination of foreign market value, not in its determination of United States price, even if ESP is being used as United States price. Under this view, the ITA, instead of adjusting ESP downward for direct selling expenses attributable to United States sales, should have adjusted foreign market value upward for those expenses. NBCA's proposed methodology would result in absolute margins identical to those arrived at under the ITA's method, but would result in lower weighted average margins.[27]

24. Examples of expenses that might constitute direct selling expenses are credit, advertising, technical services, commissions, and warranty costs.

25. The Department of Commerce study states: To the extent that any differences exist in the circumstances under which the merchandise is sold in the two markets, the foreign market price is adjusted by the net difference in the associated costs of those differing circumstances.... In effect, any such costs uniquely associated with the circumstances under which the foreign market good is sold are subtracted out of foreign market price, and any such costs uniquely associated with the circumstances under which the U.S. good is sold are added into the foreign market price. *Id.* (footnote omitted).

26. The government has not responded to NBCA's or Timken's contentions on this matter.

27. For an excellent description of these margins and the method of their calculation, see *Zenith Electronics Corp. v. United States,* 10 CIT —, —, 633 F.Supp. 1382, 1385–87 & nn. 9–11 (1986). The following hypothetical example will illustrate the different results under the ITA's and NBCA's methods. Assume an ESP of $100 before deducting direct United States sell-

ing expenses in the amount of $10; assume a foreign market value ("FMV") of $100 before deducting home market direct selling expenses in the amount of $20. As calculated by the ITA under its current method, ESP after deduction will equal $90, and foreign market value after deduction will equal $80. The absolute margin will therefore be $10. Assume a quantity of 1,000 pieces. Under the ITA's method, total margins are 1,000 (pcs.) × $10 (abs. margin) = $10,000. Total ESP = 1,000 (pcs.) × $90 (ESP) = $90,000. Weighted margins are $10,000 (total margins) ÷ $90,000 (total ESP) = 11.11%. By contrast, using NBCA's proposed method, and the same figures: assume an ESP of $100, but do not deduct any direct United States selling expenses. ESP will therefore equal $100. (For purposes of this example, assume no other adjustments.) Assume a FMV of $100. First, decrease the $20 of home market selling expenses. Then, however, adjust FMV upwards, to account for the $10 of United States selling expenses. FMV after adjustments will equal $90. The absolute margin will again be $10, and total margins will again be 1,000 (pcs.) × $10 (abs. margin) = $10,000. However, total ESP is 1,000 (pcs.) × $100 (ESP) = $100,000. Weighted margins therefore are $10,000 (total margins) ÷ by $100,000 (total ESP) = 10%—a smaller margin.

■ Timken, on the other hand, asserts that direct selling expenses incurred in the United States should never be treated as "differences in circumstances of sale" but rather must be viewed as "expenses generally incurred by or for account of the exporter" that may only be deducted from ESP under section 1677a(e)(2). This argument is unconvincing. First, section 1677a(e)(2) has been understood to refer to *indirect*, not direct, expenses. *See Consumer Products Division, SCM Corp. v. Silver Reed America, Inc.*, 753 F.2d 1033, 1036–38 (Fed.Cir.1985). Also, because section 1677a(e)(2) by its own terms applies only to ESP, Timken's interpretation would deprive the agency of *any* statutory basis for making adjustments for direct expenses attributable to United States sales if purchase price, rather than ESP, were being used as United States price. Finally, legislative history indicates that Congress understood direct selling expenses to constitute differences in circumstances of sale. *See Hearings Before the Senate Committee on Finance on H.R. 6006, An Act to Amend Certain Provisions of the Antidumping Act, 1921*, 85th Cong., 2d Sess. 19 (1958) (*Explanatory Memorandum of the Treasury Department for the Senate Finance Committee*, submitted by A. Gilmore Flues, Assistant Secretary of the Treasury) ("Senate Hearings"); *Hearings Before the House Committee on Ways and Means on H.R. 6006, 6007, and 5120, Bills to Amend Certain Provisions of the Antidumping Act of 1921*, 85th Cong., 1st Sess. 33, 39 (1957) (Treasury Department memorandum and statement of David W. Kendall, Assistant Secretary of the Treasury) ("House Hearings"). Consequently, Timken's argument that direct selling expenses attributable to United States sales are not "differences in circumstances of sale" under section 1677b(a)(4)(B), is without merit.

■ In view of the fact that direct expenses attributable to United States sales should be treated as "differences in circumstances of sale," the question remains whether the agency may permissibly adjust United States price, and, specifically, ESP, for those differences. The literal language of section 1677b(a)(4) indicates that the "differences" adjustment is to be made "[i]n determining *foreign market value*"; it does not indicate that the adjustment may instead be made in determining United States price. 19 U.S.C. § 1677b(a)(4) (emphasis added). *See Board of Governors of Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986) (courts must give effect to the unambiguously expressed intent of Congress). Also suggesting that the adjustment is to be made only in determining foreign market value is the fact that adjustments to United States price are set forth in a different section, 19 U.S.C. § 1677a, which does not include a "differences" adjustment. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983); *Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194, 1197 (6th Cir.1983).

It could perhaps be argued that the language of section 1677b(a)(4), "due allowance shall be made," is nonetheless sufficiently broad to permit adjustment to either foreign market value or to United States price, given the fact that the concept of "differences" in circumstances of sale implicitly requires evaluation of *both* the United States and the home market, so that the adjustment could logically have been placed in either the United States price or in the foreign market value statute. This argument might provide support for an agency practice of adjusting United States price rather than foreign market value,[28] were it not for legislative history indicating that Congress understood the statute to mean what it says, namely, that the adjustment should be made "[i]n determining foreign market value." The "differences" ad-

---

**28.** It could not, however, support the agency's practice of adjusting United States price when ESP is being used as United States price, but of adjusting foreign market value when purchase price is being used. This practice results in different dumping margins depending solely upon the type of United States price being used, with neither a policy nor a statutory basis for such disparity. *Cf. Smith Corona Group, supra*, 713 F.2d at 1578.

justment, added to the Antidumping Act of 1921 in 1958, was drafted by the Treasury Department,[29] and Treasury Department officials provided specific examples of how the adjustment would operate. In those examples, adjustments for differences in circumstance of sale were made to foreign market value even when those differences were attributable to United States sales. *See* Senate Hearings 19; House Hearings 39.[30] In view of this legislative history, which is consistent with the literal statutory language, the ITA's practice of making an adjustment for direct selling expenses attributable to United States sales to ESP is contrary to the statute. The case is remanded for correction of this error. *See Zenith Electronics Corp. v. United States,* 10 CIT —, 633 F.Supp. 1382 (1986) (where statute required subtraction of certain tax from ESP, ITA could not instead add that amount to home market price).

**29.** The 1958 amendments to the Antidumping Act were drafted by the Treasury Department in compliance with a congressional directive contained in the Customs Simplification Act of 1956, which called for a review by the Secretary of the Treasury of the operations and effectiveness of the 1921 Act. *See* Pub.L. 927, § 5, 84th Cong., 2d Sess., 70 Stat. 948 (1956); H.R.Rep. No. 1261, 85th Cong., 1st Sess. 2 (1957); 1921 Act, § 202(b)(2), (c)(2), *as amended by* Pub.L. 85–630, § 2, 72 Stat. 583–84 (1958), 19 U.S.C. § 161(b)(2), (c)(2) (1976). The provision was reenacted by the 1979 Trade Agreements Act, 19 U.S.C. § 1677b(a)(4)(B) (1982).

**30.** The memorandum submitted at the Senate hearings provided in relevant part:

(3) A further change in section 202(b) requires that allowance be made for differences in circumstances of sale in determining foreign market value. An example would be the payment of advertising expenses in the United States by a manufacturer attempting to introduce a product into the United States market, whereas in the home market the advertising expenses are borne by the distributors. Under the present law this would not constitute any basis for the assessment of dumping duties. *The amendment would require that the amounts expended by the manufacturer for advertising in connection with his sales to the United States be added to his home market price for the purpose of determining foreign market value;* if as a result the foreign market value is higher than the price to the United States and a finding of dumping has been made, dumping duties would be assessed in an amount equal to the difference. Converse-

## 11. *Selling Expenses: Direct or Indirect*

It is to a foreign manufacturer's advantage to have United States selling expenses characterized as indirect, rather than as direct. If they are direct, the ITA will make an adjustment for them as "differences in circumstances of sale" under 19 U.S.C. § 1677b(a)(4)(B). *See supra,* at 509 –12. That adjustment will have the effect of increasing dumping margins. If United States expenses are characterized as indirect the ITA will similarly make an adjustment for them, under 19 U.S.C. § 1677a(e)(2), which requires adjustment to ESP for "expenses generally incurred by or for the account of the exporter." That adjustment will also have the effect of increasing dumping margins. However, the ITA will "offset" that increase by reducing foreign market value by the amount of the indirect United States selling expenses. Because the indirect selling expenses are subject to this ESP "offset," *see supra,* n.

ly, if the manufacturer paid advertising costs in the home market but not in the United States, the advertising expenses would be deducted from the home market price in determining foreign market value.

Senate Hearings 19 (emphasis added). The example given at the House hearings, by the Assistant Secretary of the Treasury, was as follows:

If the home-consumption sale and the sale to the United States market are made under differing circumstances, adjustment can be made for that. Let us suppose that the bicycle manufacturer in country X gives a service guaranty for bicycles purchased for use in country X, but none for bicycles exported to the United States. The servicing costs him 50 cents per bicycle. At the same time, he pays for American dealers' advertising of the country X bicycle at the rate of $2 a bicycle, but does not pay for advertising of the country X bicycles sold for use in country X. The price comparison would be as follows, assuming a price in each case of $20 per bicycle.

CHART III a—Sale at less than fair value—Adjustment for circumstances of sale

| | |
|---|---|
| Home-consumption price | **$20.00** |
| Less servicing cost | .50 |
| Plus advertising cost | 2.00 |
| Adjustment | 1.50 |
| Adjusted home-consumption price | 21.50 |
| Price to United States | 20.00 |
| Difference | 1.50 |

This would be a sale at less than fair value. House Hearings 39.

18, the foreign manufacturer will benefit if United States selling expenses are characterized as indirect.

The foreign manufacturer benefits by having United States expenses characterized as indirect. It also benefits by having home market expenses characterized as *direct* since as a general rule only if home market expenses are direct will foreign market value be adjusted for them as "differences in circumstances of sale." *See Consumer Products Division, supra,* 753 F.2d at 1036–38. If they are indirect, foreign market value will be adjusted for them only up to the amount permitted by the ESP offset. *See supra,* n. 18.

The ITA placed the burden on NBCA of showing the indirectness of United States expenses, and the directness of home market expenses. By way of example, this resulted in certain United States advertising expenses being treated as direct expenses although home market advertising expenses as to which similar information had been provided to the agency were treated as indirect. NBCA in both cases had failed to prove the exact nature of the advertising, although it had established that the expenses were incurred.

■ Despite the seeming oddity of a method under which expenses as to which the ITA has similar information are treated differently depending upon the market in which they were incurred, the ITA acts reasonably in placing the burden of establishing adjustments on a respondent that seeks the adjustments and that has access to the necessary information. Were the ITA to act otherwise, respondents would have an incentive to destroy or to fail to produce the more detailed information that would either support or rebut their own assertions regarding directness or indirectness of various expenses.

12. *Sales Below Cost of Production: Ten–Ninety Percent Rule*

Section 1677b(b) provides that sales made at less than the cost of production in the

home market shall be disregarded in the determination of foreign market value if they

(1) have been made over an extended period of time and in substantial quantities, and

(2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade

\* \* \* \* \* \*

19 U.S.C. § 1677b(b) (1982). If the agency disregards below-cost sales under this statute and remaining, above-cost, sales are "inadequate as a basis for the determination of foreign market value," the agency is to use another method of determining foreign market value. *Id.*

To implement these statutory directives, the ITA uses the so-called "ten-ninety percent" rule. Under this rule, if less than ten percent of home market sales (in this case, of a particular TRB model) are sold below cost during the review period, none of those below-cost sales are disregarded. If ten percent through ninety percent of the home market sales are below cost, those below-cost sales, only, are disregarded. If more than ninety percent of home market sales are below cost, all home market sales are disregarded and constructed value is used to determine foreign market value. *Second Redetermination* 6, 33–35.

According to the government, the ten-percent aspect of this rule represents long-standing agency practice.[31] *See Second Redetermination* 34; *Tubes for Tires, Other than for Bicycle Tires, from Korea,* 49 Fed.Reg. 26,780, 26,782 (Dep't Comm. 1984) (final determination) (Department has generally applied a ten-percent rule in determining whether to disregard below-cost sales). Government counsel represents, however, that if in a particular case application of the rule were not appropriate, it would be adjusted accordingly. Transcript of oral argument, August 5, 1987, at 50–51. Thus, in cases involving perishable vegeta-

---

**31.** The government does not indicate whether the ninety-percent aspect of the rule similarly

represents long-standing agency practice.

bles, a fifty-percent test is applied because below-cost sales are a more common occurrence in such instances. *See id.; Southwest Florida Winter Vegetable Growers Ass'n v. United States,* 7 CIT 99, 103–05, 584 F.Supp. 10, 15–16 (1984); *Fall–Harvested Round White Potatoes From Canada,* 48 Fed.Reg. 51,669, 51,670 (Dep't Comm.1983) (final determination).

NTN contends that the ten-ninety percent rule does not implement the requirements of section 1677b(b), and, in the alternative, that the rule should have been promulgated in accordance with the notice and comment procedures of the Administrative Procedures Act ("APA"). *See* 5 U.S.C. § 553 (1982). The ITA counters that not only does the rule implement the statutory scheme, it is an "interpretive rule" and so not subject to notice and comment requirements. *See id.* at § 553(b).

■ The APA requires notice and comment procedures in connection with agency rule-making but makes an exception for "interpretative rules." *Id.* Interpretative rules are " 'statements as to what the administrative officer thinks the statute or regulation means.' " *Cabais v. Egger,* 690 F.2d 234, 238 (D.C.Cir.1982) (quoting *Gibson Wine Co. v. Snyder,* 194 F.2d 329, 331 (D.C.Cir.1952)). They clarify or explain existing law, rather than creating new law, rights, or duties, *Southern California Edison Co. v. FERC,* 770 F.2d 779, 783 (9th Cir.1985); *Carlisle Tire & Rubber Co. v. United States,* 10 CIT ——, ——, 634 F.Supp. 419, 423 (1986), and are to be distinguished from so-called "legislative rules." Unlike legislative rules, which have the force of law if reasonable and validly promulgated, interpretative rules do not bind a court and a court is free to substitute its judgment

for the agency's, although it may defer to the agency's interpretation. *See McKenzie v. Bowen,* 787 F.2d 1216 (8th Cir.1986); *American Trucking Ass'n v. United States,* 688 F.2d 1337, 1342 (11th Cir.1982); 2 K. Davis, *Administrative Law Treatise* § 7:13, at 59 (2d ed. 1979); *cf. Batterton v. Francis,* 432 U.S. 416, 424–25, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977).

## A. *Ten–Percent Test—Substantial Quantities*

■ Against this background, we review first the ten-percent component ("ten-percent test") of the ten-ninety percent rule. Section 1677b(b) provides that below-cost sales shall be disregarded if, *inter alia,* the sales have been made "over an extended period of time *and in substantial quantities.*" 19 U.S.C. § 1677b(b)(1) (emphasis added). The agency practice of disregarding below-cost sales that represent less than ten percent of total home market sales in effect constitutes an interpretation of the term "substantial quantities." Below-cost sales of ten percent or more are considered substantial; below-cost sales of less than ten percent are considered insubstantial. In this respect, then, the rule is interpretative and not subject to the notice and comment requirements of the APA.

Turning to the merits of this interpretation, legislative history indicates that section 1677b(b) is "designed to ensure that sales made at less than cost of production will not automatically be excluded from consideration," H.R.Rep. No. 571, 93d Cong., 1st Sess. 71 (1973) ("House Report No. 571"), but provides little guidance as to what specific quantity of sales should be considered "substantial." [32] Nevertheless, the agency must, as a practical matter,

---

**32.** Legislative history does provide examples of the sorts of below-cost sales that Congress considered legitimate and not likely to be excluded under the statute:

> [F]requently it is normal business practice, both in foreign countries and the United States to sell obsolete or end-of-model-year merchandise at less than cost. Similarly, certain products, such as commercial airliners, typically require large research and development costs before introduction and initially are sold at prices which do not reflect all

overhead costs. If, however, such prices will permit recovery of all costs based upon anticipated sales volume over a reasonable period of time, such sales will not be disregarded. On the other hand, systematic sales at less than all cost of production at prices which will not permit recovery of costs will be disregarded....

House Report No. 571, at 71; *see* S.Rep. No. 1298, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 7186, 7310–11.

give some concrete interpretation to that term. To do so, the agency has picked a percentage that can reasonably be understood as "substantial"—ten percent—and applies it unless particular circumstances indicate its inappropriateness. In the court's view, this is a reasonable and perhaps the only practical way of interpreting and administering the statute.

The court is aware of the fact that Congress's use of the term "substantial" rather than of a specific percentage figure may indicate that a case-specific analysis was intended. *Cf. Toho Titanium Co. v. United States,* 11 CIT ——, ——, 657 F.Supp. 1280, 1285 (1987) (use of phrase "extended period of time" in section 1677b(b) indicates that agency determination should be made after review of industry under investigation). However, the ten-percent test is consistent with this intent, given the vagueness of the term "substantial"; the likelihood that usually there will not be industry characteristics sufficient to support fine distinctions between cases on the basis of "substantiality"; and the agency's use of the ten-percent test as a benchmark only, to be applied absent indication on the facts before it that use of the percentage will not implement legislative intent.[33] The court therefore upholds the agency's use of the ten-percent test insofar as it interprets the term "substantial."[34] However, as is discussed below, the court finds the ten-ninety percent rule invalid in all other respects.[35]

### B. Ten–Percent Test—Sales Made Over Extended Period

Section 1677b(b) provides that below-cost sales may be disregarded only if they "have been made *over an extended period of time*" as well as in substantial quantities. 19 U.S.C. § 1677b(b)(1) (emphasis added). The ITA apparently relied on the ten-percent test to satisfy the "extended period of time" requirement, as well as the substantiality requirement. But it does not follow from the fact that more than ten percent of a product has been sold below cost, that those sales occurred over an "extended period of time." And while it is true that the ITA reviewed a period of more than a year, the court cannot ascertain from the agency's determination whether the below-cost sales were made over that period. *Cf. Toho Titanium Co., supra,* 657 F.Supp. at 1285 (court found that sales were made over extended period of time, where they were made in each of the six months under investigation). Consequently, the agency's use of the ten-percent test to satisfy the "extended period of time" requirement is disapproved, and the case is remanded for a determination as to whether below-cost sales disregarded by the agency under section 1677b(b) were made over an extended period of time.

### C. Ten–Percent Test—Recovery of Costs

Section 1677b(b) provides that, for below-cost sales to be disregarded, the sales must not only be substantial and

---

33. Use of such a "benchmark" approach is not new to the agency. Thus, in *Certain Steel Wire Nails from Republic of Korea,* 47 Fed.Reg. 27,-392 (Dep't Comm.1982) (final determination), the ITA, addressing the issue of whether sales were adequate for a determination of foreign market value, stated that it looked to whether sales were five percent or more of the quantity shipped to the United States, but that

> "'the use ... of the 5% benchmark ... does not establish a rigid rule of general application. The 5% benchmark does provide a guideline from which our analysis begins but in some cases there may be particular facts that require another result in order to implement the purposes of the Act. In this case there are no such special facts.'"

*Id.* at 27,395 (citation omitted).

34. As is discussed, *infra,* at 515–17, the ten-percent test does not adequately implement the other statutory requirements that below-cost sales, to be disregarded, must be made over an "extended" period of time, and must be at prices that will not permit recovery of costs within a reasonable period of time in the ordinary course of trade. *See* 19 U.S.C. § 1677b(b)(1)–(2).

35. In view of this conclusion, it is not necessary to determine whether any other aspect of that rule is "interpretative" within the meaning of the APA. *Cf. NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 291, 94 S.Ct. 1757, 1770, 40 L.Ed.2d 134 (1974) (where Court determined that NLRB had applied wrong legal standard, it did not have to consider whether standard should have been promulgated under APA).

made over an extended period of time, but must also be at prices that will not permit "recovery of all costs within a reasonable period of time in the normal course of trade." 19 U.S.C. § 1677b(b)(2). The ITA claims that the ten-percent test satisfies this statutory requirement as well. Specifically, it asserts that "the [ten-percent] test *reasonably presumes* that if below-cost sales comprise more than 10% of all sales ... their costs cannot be recovered within a reasonable period of time so that the below-cost sales must be disregarded in order to carry out the intent of Congress." Government brief 42 (emphasis added). No argument or evidence is adduced to support this "presumption," which appears unwarranted.[36] Logic suggests that in order to determine whether costs will eventually be recovered by sales at below-cost prices, it is necessary to consider factors such as how far below cost the sales are; how much, if at all, costs of production are expected to decline; and the period of time over which they are expected to decline. *See Toho Titanium Co., supra,* 657 F.Supp. at 1286 (if cost of production declines, below-cost prices may allow recoupment of all costs at some future date). The ITA's test, which simply determines whether below-cost sales are above ten percent of total sales, addresses none of these factors.[37]

*Toho Titanium Co.* is in point. In that case the ITA provided no support for its assertion that below-cost sales were not at prices that would permit recovery of costs. The court remanded for an explanation of why recovery was not possible. *Id.* at 1286. Similarly, the agency here provides no valid support for its assertion that costs cannot be recovered. The case is therefore remanded for further consideration on this issue.[38]

In this context, NBCA has set forth a number of hypothetical examples allegedly illustrating situations in which below-cost sales that represent more than ten percent of total sales will recoup all production costs. Intervenor's memorandum 31–34. All of these examples call for the averaging of below-cost *and* above-cost home market prices, and then comparing the resulting average price to the cost of production. NBCA proposes that if the average price of all sales is higher than the cost of production, then the merchandise has been sold at prices which "permit recovery of all costs," within the meaning of section 1677b(b)(2).

As before noted, section 1677b(b) provides:

.... If the administering authority determines *that sales made at less than the cost of production—*

\* \* \* \* \* \*

(2) *are not at prices which permit recovery of all costs* within a reasonable period of time in the normal course of trade, such sales shall be disregarded in the determination of foreign market value....

(emphasis added). A tacit assumption underlying NBCA's hypothetical examples is that the term "prices" in the statutory phrase "at prices which permit recovery of all costs" refers to the average price of *all* sales, not just to the prices of below-cost sales.[39] The language of the statute does

---

**36.** Unlike the agency's use of the ten-percent test to interpret the vague term "substantial quantities," here, the agency is using the ten-percent test as a methodology allegedly satisfying a specific statutory requirement that the agency assess whether costs will or will not be recovered.

**37.** The hypothetical example given in the House report, quoted *supra,* n. 32, concerning production of commercial airliners, exemplifies a situation in which costs may eventually be recovered by below-cost prices, and yet in which far more than ten percent of sales are likely to be made below cost for a period of time. House Report No. 571, at 71; *cf. Toho Titanium Co., supra,* 657 F.Supp. at 1286 (in case in which all

home market sales in period under review were below cost of production, court remands for explanation from ITA of why company would not be able to recoup its costs).

**38.** Section 1677b(b)(2) also requires that the costs be recoverable within "a reasonable period of time" in the normal course of trade. The court is unable to determine on this record what is a "reasonable" period of time.

**39.** The government has not addressed this issue. Counsel for Timken argues that section 1677b(b) does not call for the averaging of prices of both above and below-cost sales. Transcript of oral argument 61.

not permit such an interpretation. The term "prices" clearly refers only to prices of "sales made at less than the cost of production" referred to a few lines above in the statute. Consequently, the remand for consideration by the ITA of whether costs will or will not be recovered is not to be understood as sanctioning use of the methodology proposed by NBCA on this appeal.

### D. *Ninety–Percent Test*

■ Section 1677b(b) provides that:
Whenever sales are disregarded by virtue of having been made at less than the cost of production *and the remaining sales, made at not less than cost of production, are determined to be inadequate as a basis for the determination of foreign market value* under subsection (a) of this section, the administering authority shall employ the constructed value of the merchandise to determine its foreign market value.

(emphasis added). The ITA finds home market sales "inadequate" under this statute if more than ninety percent of home market sales were below cost. The agency's use of this ninety-percent test is inappropriate for the simple reason that there is an applicable and conflicting agency regulation. *See* 19 C.F.R. § 353.4 (1987). Section 353.4 provides that if it is established that the quantity of merchandise in the home market is "so small in relation to the quantity sold for exportation to countries other than the United States (normally, less

than five percent of the amount sold to third countries)" as to be an inadequate basis for determining foreign market value, value shall be determined by reference to third country sales or constructed value. *Id.*[40] The origin of this test is subsection (a) of 19 U.S.C. § 1677b, rather than subsection (b), the subsection here in issue.[41] However, section 1677b(b) incorporates section 1677b(a) by reference.[42] Additionally, the government concedes that section 353.4 is the "implementing regulation" for section 1677b(b). Government brief 44. An agency is required to follow its own regulations. 2 K. Davis, *Administrative Law Treatise* § 7.21, at 98 (2d ed. 1979). Consequently, the agency should have used section 353.4 to determine whether home market sales provided an adequate basis for determining foreign market value. A remand is not necessary for this purpose, however, as the ITA represents that it has redone its calculations under section 353.4 and that under those calculations, as under calculations previously performed, home market sales are adequate for determining foreign market value.

### 13. *Methodology Used to Determine Below-cost Sales*

■ In determining whether the remaining above-cost home market sales were adequate for determining foreign market value, the agency looked at home market sales that had occurred over the entire period under review. NBCA pro-

---

**40.** Section 353.4(a) provides in full:

*Foreign market value where sales in the country of exportation are inadequate.*

(a) In general. If it is established *in any circumstance* other than that provided for in § 353.9 that during the representative period chosen for investigation the quantity of such or similar merchandise sold for consumption in the country of exportation *is so small in relation to the quantity sold for exportation to countries other than the United States (normally, less than five percent of the amount sold to third countries) as to be an inadequate basis for determining the foreign market value of the merchandise imported into the United States,* the foreign market value of the imported merchandise shall be determined either by reference to the price at which such or similar merchandise is sold or offered for sale for exportation to countries

other than the United States or by reference to its constructed value.
(emphasis added).

**41.** Subsection (a) of 19 U.S.C. § 1677b (1982 & Supp. III 1985) provides that if the agency determines that "the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an inadequate basis for comparison" the price in countries other than the United States or constructed value should be used. 19 U.S.C. § 1677b(a)(1), (2).

**42.** Subsection (b) provides that constructed value should be used when remaining, above-cost, sales are "determined to be inadequate as a basis for the determination of foreign market value *under subsection (a)* of this section." 19 U.S.C. § 1677b(b) (emphasis added).

tests that the ITA should have ascertained whether remaining above-cost sales were adequate on a monthly basis, not on a full-period basis, because the agency had calculated foreign market value on a monthly basis. The court finds that the ITA acted within its discretion in using different time periods for determining foreign market value and for determining adequacy of above-cost sales. First, the issue of whether sales in the home market create an adequate market for comparison with sales in the United States is an issue conceptually distinct from that of how frequently foreign market value should be determined. Second, to require the ITA to base its determinations of market adequacy on the same time period used for determining foreign market value would permit manipulation by a foreign manufacturer of the method by which foreign market value is calculated. The manufacturer could, for example, concentrate its major above-cost sales in certain months to avoid having a significant number of above-cost sales in other months, and so ensure use of constructed value or of third-country prices in those other months.

### 14. *Cost of Production: Selling Expenses*

■■■ As discussed above, the ITA, under 19 U.S.C. § 1677b(b), is required to disregard certain home market sales that are made at prices less than the "cost of production." 19 U.S.C. § 1677b(b); *see supra*, at 42.[43] The ITA understands "cost of production" to include general selling and administrative costs. NBCA objects to the inclusion of general selling and administrative costs, arguing that, by its own terms,

the phrase "cost of production" does not include anything but factory costs.

Contrary to NBCA's assertion, the phrase "cost of production" is not so self-explanatory as to necessarily exclude general selling and administrative costs. Rather, it may reasonably be understood as encompassing a broader range of costs associated with a piece of merchandise including the less apparent but nonetheless essential general selling and administrative costs. Such an interpretation is, moreover, consistent with probable congressional intent. Legislative history reflects a concern that unless below-cost sales are disregarded, "sales uniformly made at less than cost of production could escape the purview of the Act, and thereby cause injury to United States industry with impunity." S.Rep. No. 1298, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 7186, 7310. Under NBCA's interpretation of "cost of production," a foreign manufacturer could "uniformly" make home market sales at unnaturally low prices covering only factory costs, and yet "escape the purview of the Act." For these reasons, the ITA's interpretation of the term "cost of production" is reasonable, and is upheld.

### 15. *Deduction of Profit from ESP*

Section 204 of the Antidumping Act of 1921 provided that there shall be deducted from ESP "the amount of the commissions, if any, for selling in the United States the particular merchandise under consideration." 1921 Act, § 204, *as amended,* 19 U.S.C. § 163 (1976).[44] In its previous opinion, the court found that the ITA had correctly interpreted section 204 to require deduction from ESP of only "commissions," and not of "commissions and prof-

**43.** The equivalent 1921 Act section is section 205(b), *as amended,* 19 U.S.C. § 164(b) (1976).

**44.** Section 204 requires other deductions as well, providing that ESP shall be reduced by: (1) the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States, (2) the amount of commissions, if any, for selling in the United States the

particular merchandise under consideration, (3) an amount equal to the expenses, if any, generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise, (4) the amount of any export tax imposed by the country of exportation on the exportation of the merchandise to the United States, and (5) the amount of any increased value, including....

19 U.S.C. § 163 (1976).

its." *See* 630 F.Supp. at 1341–48. Timken had argued, *inter alia,* that "commissions" should be read "commissions and profits" in order to conform the 1921 Act to a provision of the 1979 International Anti-dumping Code ("International Code" or "Code"), a multilateral agreement implemented by the Trade Agreements Act of 1979. Agreement on Implementation of Article VI of the General Agreements on Tariffs and Trade, Apr. 12, 1979, 31 U.S.T. 4919, T.I.A.S. 9650, *reprinted in* H.R.Doc. No. 153, part I, 96th Cong., 1st Sess. 313–14 (1979); 19 U.S.C. §§ 2503(a), 2503(c)(6) (1982). The International Code allegedly requires deduction of profits from ESP. *See* 630 F.Supp. at 1345–47.[45] The court declined to interpret the term "commissions" in light of the Code provision, in part because the Code entered into force in 1979, whereas section 204 was enacted in 1921. *See* 630 F.Supp. at 1347; 19 U.S.C. § 1671 note (1982). The court reserved decision, however, on whether the Code provision has any bearing on interpretation of the *1979* Act ESP provision. That question is now before the court.

The 1979 Act, which repealed the Anti-dumping Act of 1921, implemented the International Antidumping Code and other international trade agreements.[46] However, the 1979 Act ESP provision, 19 U.S.C. § 1677a(e) (1982), is in relevant part identical to the 1921 Act provision, in that it provides only for deduction of "commissions," not of "commissions and profits." *Id.* at § 1677a(e)(1).[47] This literal language indicates that only "commissions" should

be deducted. *See* 630 F.Supp. at 1342–45; *United States v. H. Rosenthal Co.,* 609 F.2d 999, 1001 (C.C.P.A.1979) (legislative intent is determined in first instance by reference to the statutory language, presumably used in its normal sense; if language is clear and unambiguous, there is no reason to reject its meaning and search for another); *United States v. Corning Glass Works,* 586 F.2d 822, 825 (C.C.P.A. 1978) (creation of an ambiguity in an otherwise clear and unambiguous statute is improper).

Not only the literal language but also legislative history indicates that only commissions should be deducted, because legislative history shows that Congress intended the 1979 Act provision to reenact the 1921 Act ESP provision except as indicated. Thus, the Senate report on the bill that became the 1979 Act indicates that no change in substantive antidumping rules was intended except as specifically noted in the report; that administrative and judicial precedents were to continue under the new law; and that the 1979 Act section pertaining to United States price, including ESP, merely reenacted the provisions of the 1921 Act with only one substantive change (a change not relevant here). S.Rep. No. 249, at 93, 107, *reprinted in* 1979 U.S.Code Cong. & Ad.News 381, 479, 493. Given the literal language of the statute, past agency practice, *see* 630 F.Supp. at 1342–43, and this legislative history indicating that 1979 Act ESP law remained the same except where indicated, it is highly improbable

---

**45.** The relevant provision of the International Code provides for construction of an export price that is the analogue of exporter's sales price under United States law, and that will be referred to herein as the Code's ESP provision. That provision states that in constructing ESP, "allowance for costs, including duties and taxes, incurred between importation and resale, and *for profits accruing,* should also be made." International Code, art. 2, paras. 5–6 (emphasis added); *see* 630 F.Supp. at 1345–46. As is discussed in the court's previous opinion, that portion of the provision calling for deduction of profits accruing could be understood as hortatory rather than mandatory. *See* 630 F.Supp. at 1346–47. The court need not determine how the Code provision should be interpreted.

**46.** See *supra,* n. 10.

**47.** The ESP provisions do differ in a number of ways not relevant here. One difference is in terminology, in that the 1921 Act statute defines exporter's sales price as being a certain price "less" specified amounts, including the amount of commissions for selling the merchandise under consideration. 19 U.S.C. § 163 (1976). The 1979 Act, by contrast, requires that the exporter's sales price be "adjusted by being reduced by" specified amounts, including commissions for selling in the United States the particular merchandise under consideration. 19 U.S.C. § 1677a(e) (1982). For convenience, the court in this opinion will refer to both provisions as requiring the "deduction" of commissions from ESP.

that Congress intended the term "commissions" in the 1979 Act to cover "commissions and profits." [48] *Cf. In re N.C. Trading, a Division of Minemet Metals, Inc.,* 586 F.2d 221, 230 (C.C.P.A.1978) (court rejects proposed statutory interpretation altering law to permit intervention in previously two-party actions, where highly improbable that Congress would have intended such change without mentioning it in legislative history).

Timken appears to be arguing, not so much that Congress actually intended the term "commissions" in the 1979 Act to mean "commissions and profits," as that Congress's failure to so intend was merely an oversight, given congressional intent that the 1979 Act be consistent with the Code. *See* 630 F.Supp. at 1346, and citations therein; S.Rep. No. 249, at 15–16, *reprinted in* 1979 U.S.Code Cong. & Ad. News 401–02 (1979 Act repeals 1921 Act and replaces it with statute built upon the 1921 Act and consistent with the Code). Under this argument, the 1979 Act ESP provision is not in conflict with the Code, but is merely silent on an issue addressed by the Code.[49] According to Timken, the ITA is therefore obliged to comply with the Code provision.

The court cannot agree that the ITA should follow a Code provision not incorporated into United States law. The Code has no independent force as law. H.R.Rep. No. 317, 96th Cong., 1st Sess. 1, 41 (1979) ("H.Rep. No. 317") (trade agreements are

not self-executing and do not have independent effect under United States law); *Statements of Administrative Action 4, reprinted in* H.R.Doc. No. 153, 96th Cong., 1st Sess., part II (1979), *and in* 1979 U.S. Code Cong. & Ad.News 665, 667 (trade agreements are not self-executing and do not have independent effect under United States law, although Act has been developed to be fully consistent with agreements). Additionally, although the 1979 Act was intended to be consistent with the Code and with other trade agreements, Congress recognized the possibility that it might nonetheless fail to adequately implement the agreements, as is manifest from a provision of the 1979 Act setting forth the procedures for amending United States law if necessary to implement any requirement of one of the agreements implemented by the Act.[50]

■ In light of all this, the court declines to require the ITA to follow the Code provision regarding deduction of profits from ESP; to so require would be in effect to give the Code the status of independent law. This is not to say, of course, that a court may not look to the provisions of a trade agreement for guidance on how a statutory silence should be treated, or on how an ambiguity in United States law should be resolved. *See Rose v. Lundy,* 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982) (arguments of policy are relevant when statute has a hiatus that

---

**48.** Indeed, had Congress intended such a deduction, it could readily have adopted the language of the International Code itself.

**49.** If the Code and United States law are in conflict, there is no question that United States law prevails. *See* 19 U.S.C. § 2504(a) (1982).

**50.** Timken's argument that the silence of the 1979 Act on deduction of profits must be an oversight is in any event not very persuasive. It is clear that the bill that became the 1979 Act was subject to careful scrutiny by Congress. *See, e.g.,* H.R.Rep. No. 317, at 5–8 (multilateral trade negotiations implemented by the 1979 Act were authorized by Trade Act of 1974, which required close consultation with each committee having jurisdiction over legislation involving the subject matter affected by the agreements; the House Committee on Ways and Means and other committees reviewed for a number of months and carefully analyzed the results of the

negotiations); S.Rep. 249, at 3–6, *reprinted in* 1979 U.S.Code Cong. Ad.News 389–92 (Trade Act of 1974 requires congressional monitoring and advice during course of multilateral trade negotiations; numerous meetings regarding implementation of agreements). Possibly, Congress perceived the 1979 Act and the Code as being consistent despite the absence in the 1979 Act of a provision for deduction of profits from ESP, because the language of the International Code calling for deduction of profits was understood to be only hortatory, not mandatory. *See* 630 F.Supp. at 1346–47. The fact that other signatories of the Code now uniformly read the Code's language as mandatory—if, as Timken claims, that is the case—does not alter the fact that the United States Congress may have viewed the language as hortatory, and thus not inconsistent with United States law.

must be filled or there are ambiguities in legislative language); *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796–97, 63 L.Ed.2d 22 (1980) (courts will further legislative goals by filling interstitial silences within statute or regulation); *Four "H" Corp. v. United States,* —— CIT ——, ——, 611 F.Supp. 981, 984 (1985). When there is a gap or ambiguity in the law, the court's attempt is to " 'discern dispositive legislative intent by "projecting as well as it could how the legislature would have dealt with the concrete situation if it had but spoken." ' " *Asahi Chemical Industry Co. v. United States,* 4 CIT 120, 124, 548 F.Supp. 1261, 1265 (1982) (citations omitted); *Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 51 & n. 13, 592 F.Supp. 1318, 1323 & n. 13 (1984). The provisions of a trade agreement may well be helpful in discerning such intent. *Cf. United States Steel Corp. v. United States,* —— CIT ——, ——, 618 F.Supp. 496, 500–02 (1985) (where statute silent on duration of provisional remedy and not clear in meaning, intent, and application, the interpretation that resulted in conformity with the GATT subsidy code would be upheld). Here, however, there is neither interstitial silence nor ambiguity. The 1979 Act ESP provision does not, for example, require agency action without providing adequate guidance as to how that action should be carried out; does not use a general term to which the agency must give greater definition; and is not ambiguous. To the contrary, the ESP provision sets forth a discrete list of deductions which are in relevant part self-explanatory. Therefore, the unimplemented provision of the Code may not be given effect.

### 16. *Conclusion*

The action is remanded to the ITA for (1) a determination of whether merchandise compared was of approximately equal commercial value; (2) correction of computer errors undermining the agency's chosen methodology of selecting such or similar merchandise without regard to the level of trade at which the merchandise was sold, and for any adjustments then necessary to properly take into account differences in levels of trade; (3) consideration of the allegations of error made by Timken in section IV. A. and IV. B. of its confidential brief; (4) consideration of NBCA's contentions regarding usual commercial quantities and ordinary course of trade; (5) correction of the agency error of making certain adjustments for differences in circumstances of sale to ESP rather than to foreign market value; (6) determination of whether below-cost sales disregarded by the agency in its calculation of foreign market value were made over an extended period of time; (7) determination of whether below-cost sales disregarded by the agency were at prices that would not permit recovery of all costs within a reasonable period of time in the normal course of trade.