NTN BEARING CORPORATION OF AMERICA, American NTN Bearing Manufacturing Corporation, and NTN Toyo Bearing Co., Ltd., Plaintiffs,

v.

UNITED STATES, Defendant,

and

The Timken Company, Defendant–Intervenor.

Court No. 87–11–01066.

United States Court of International Trade.

Sept. 7, 1990.

Barnes, Richardson & Colburn (Robert E. Burke, Donald J. Unger and J. Kevin Horgan), for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (Velta Melnbrencis, of counsel), Stephanie J. Mitchell, Atty.–Advisor, Office of Chief Counsel for Import Admin., Dept. of Commerce, for defendant.

Stewart & Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon and John M. Breen, of counsel), Scott A. Scherff, Sr. Corporate Counsel, The Timken Co., for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

This action is presently before the court on plaintiffs', NTN BEARING CORPORATION of AMERICA, AMERICAN NTN BEARING MANUFACTURING CORPORATION and NTN TOYO BEARING COMPANY, LTD. (collectively "NTN"), motion, pursuant to Rule 56.1 of the Rules of this Court, for judgment on the agency record as to Counts II through VI of its complaint as supplemented. The court's jurisdiction is predicated upon 28 U.S.C. § 1581(c).[1]

Plaintiffs challenge the legality of the antidumping determination published by the United States Department of Commerce, International Trade Administration ("ITA" or "Commerce") on August 17, 1987. *Final Determination of Sales at Less Than Fair Value; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan,* 52 Fed.Reg. 30,700, *amended,* 52 Fed.Reg. 47,955 (Dec. 17, 1987). Plaintiffs charge that the ITA's calculations are significantly flawed and that the final antidumping determination is not supported by substantial evidence in the administrative record, and specifically allege the following:

1. the ITA should not have included tapered roller bearing ("TRB") component parts within the scope of its investigation;

2. the ITA erred in not applying the "special rule" provided in 19 C.F.R. § 353.56(b) (1987) when computing its currency conversion rate;

3. the ITA failed to select the most similar merchandise when conducting its fair market value ("FMV") calculation;

4. the ITA's computed exporter's sales price ("ESP") reflected an improper calculation of NTN's depreciation expenses;

---

1. 28 U.S.C. § 1581(c) (1982) provides in pertinent part:

The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930.

5. the ITA unlawfully deducted direct United States selling expenses from exporter's sales price;

6. the ITA's practice in determining whether or not to consider sales below cost is contrary to law;

7. the ITA's calculation of fair market value for individual cups and cones by "splitting" unitary set prices in the home market is unlawful;

8. the ITA should have made a circumstance of sale adjustment to fair market value for warehouse expenses incurred by NTN;

9. the ITA unlawfully included sales not made "in the usual commercial quantities" in the home market sales it considered;

10. the ITA unlawfully included general and administrative expenses in its cost of production calculation;

11. the ITA understated the level of trade adjustment to fair market value; and

12. the ITA failed to include warehouse expenses in the ESP offset pool.

Commerce refutes plaintiffs' contentions except that it concedes the inadvertent exclusion of certain pertinent data in the ITA's calculation of ESP offset pool. Consequently, Commerce maintains, the case should be remanded to the ITA to correct this error. Defendant-intervenor opposes plaintiffs' motion as well as Commerce's request for remand. For the reasons detailed below, the Court finds that this case must be remanded to the ITA so that appropriate corrections can be made to the dumping calculations.

*Background*

In response to a petition filed by The Timken Company on behalf of the domestic industry, the ITA initiated an antidumping investigation of all tapered roller bearing imports from Japan not already subject to an existing dumping order. *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan; Initiation of Antidumping Duty Investigation*, 51 Fed.Reg. 33,286 (Sept. 19, 1986). The ITA completed its investigation and determined that certain Japanese import-

ers, including plaintiffs herein, were engaging in sales of TRBs in the United States at less than fair value ("LTFV"). 52 Fed. Reg. 30,700. The International Trade Commission ("Commission") further determined that a domestic industry was materially injured or threatened with material injury as a consequence of said sales. *Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers From Japan*, USITC Pub. 2020 (1987). The imported TRBs and parts thereof were therefore made subject to an antidumping duty order.

On December 3, 1987, NTN instituted this action challenging certain aspects of Commerce's final determination. Pending disposition of the case, however, the ITA reviewed its calculations and issued an amended final determination on December 17, 1987. *Amendment to Final Determination of Sales at Less Than Fair Value and Amendment to Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan*. 52 Fed.Reg. 47,955. Thus, the Court permitted plaintiffs to file a supplemental complaint incorporating any changes prompted by the ITA's amendment.

By the instant motion, plaintiffs move for judgment on the agency record as to Counts II through VI of the complaint as supplemented. Count I of the complaint was adjudicated separately and is, therefore, not considered herein.

Plaintiffs come before the court pursuant to 19 U.S.C. § 1516a(a)(2) (1982). As such, the applicable standard of review is whether Commerce's actions were supported by substantial evidence and otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B); *Toho Titanium Co. v. United States*, 11 CIT 160, 164, 657 F.Supp. 1280, 1283 (1987).

*Discussion*

1. Scope of the Investigation

A TRB consists of various components which are combined to create the finished bearing. When Commerce investigated

TRB imports from Japan, it included within the scope of its investigation plaintiffs' imports of TRB component parts.[2] Commerce calculated a United States price for the components by "taking the sale price of the completed TRBs and attributing a portion of that price to the imported parts" and found these itemized prices to be at less than fair value. *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment on the Agency Record as to Counts II Through VI of Their Complaint as Supplemented ("Defendant's Memo")* at 8–9. Consequently, when Commerce issued its final affirmative antidumping duty determination, TRB component parts imported by NTN became subject to antidumping duties.

Plaintiffs allege that because their imports of TRB components are used solely to supply their subsidiary, AMERICAN NTN BEARING MANUFACTURING CORP., Commerce unlawfully included the TRB components within the scope of its investigation. NTN contends that since the imported components were simply transferred intracompany, no *actual sales* of components occurred in the United States. In the absence of a "sale of imported merchandise," plaintiffs maintain, the antidumping laws of this country are not invoked. *Plaintiffs' Memorandum in Support of Their Motion for Judgment on the Agency Record As to Counts II Through VI of Their Complaint As Supplemented ("Plaintiffs' Memo")* at 10.

Commerce, in turn, claims it was compelled to include TRB component parts imported within the scope of its investigation because they were specified in the petition. Additionally, Commerce maintains that TRB component parts are properly included in the antidumping determination because "[i]f plaintiffs' argument were accepted,

then all foreign manufacturers could circumvent the application of the antidumping law by establishing finishing operations in the United States by one of their subsidiaries and 'transferring' the unfinished product to their subsidiaries for completion and subsequent resale. *Defendant's Memo* at 10.

Procedures for the initiation of antidumping duty investigations are outlined in 19 U.S.C. § 1673a (1982 & Supp. V 1987), whereby the administering authority is required to commence an antidumping investigation whenever an interested party (as defined by the statute) files an adequate petition alleging the necessary elements. Upon receipt of such a petition, the ITA's role in examining its sufficiency is limited to a ministerial function. *Republic Steel Corp. v. United States*, 4 CIT 33, 35, 544 F.Supp. 901, 904 (1982).

> The law states that [the ITA] shall determine only two things, first "whether the petition alleges the elements necessary for the imposition of a duty under section 701(a)" [19 U.S.C. § 1671(a) ] and second, whether the petition "contains information reasonably available to the petitioner supporting the allegations."

*Id.* If the petition is deemed sufficient, the ITA is statutorily obliged to insure that the proceedings are maintained in a form which corresponds to the petitioner's clearly evinced intent and purpose. *Mitsubishi Elec. Corp. v. United States*, 12 CIT ——, 700 F.Supp. 538 (1988), *aff'd*, 898 F.2d 1577 (Fed.Cir.1990).

In the instant action, The Timken Company filed with the ITA a comprehensive petition requesting it to investigate completed TRBs imported from Japan, as well as unfinished TRBs and parts thereof. A.R.Doc. 1.[3] Against this backdrop, then, Commerce

**2.** The undisputed record reveals that these components are used in the manufacture of TRBs by NTN's subsidiary at its plant in Elgin, Illinois. The finished TRBs *are* sold in the United States.

**3.** The Timken Company's petition is replete with references indicating its intention that TRB parts be included within the scope of the investigation:

> (i) The merchandise covered by this petition is all tapered roller bearings, tapered

rollers and other parts thereof (both finished and unfinished) including, but not limited to, single-row, multiple-row (e.g., two-, four-), and thrust bearings and self-contained bearing packages (generally pre-set, presealed, and pre-greased), .... A.R. Doc. 1 at 7.

> (v) Subject to this petition are the complete bearing (cone assembly and cup in sets), cups alone, *cone assemblies alone, and the parts of* tapered roller bearings (cones, rollers, retain-

maintains that it was compelled to administer its investigation in strict accordance with the petition. The Court is not prepared, however, to divest Commerce of the broad discretion it has traditionally been afforded. *See Mitsubishi,* 700 F.Supp. at 552.

■ The very language of the statute prescribes that a "petition may be amended at such time, and upon such conditions, as the administering authority and the Commission may permit." 19 U.S.C. § 1673a(b)(1). Where congressional intent is unambiguously stated in the language of the statute, further inquiry is unnecessary. *Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 788 (Fed.Cir.1988), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988).

This court has repeatedly opined that the ITA has inherent authority to define the scope of an antidumping duty investigation. *Diversified Prod. Corp. v. United States,* 6 CIT 155, 159, 572 F.Supp. 883, 887 (1983); *accord, Royal Business Machines, Inc. v. United States,* 1 CIT 80, 507 F.Supp. 1007 (1980), *aff'd,* 69 CCPA 61, 669 F.2d 692 (1982). Necessarily then, had the ITA determined the petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective, it possessed inherent authority to redefine and clarify the parameters of its investigation. *The Torrington Co. v. United States,* 14 CIT ――, Slip Op. 90–73, 745 F.Supp. 718 (August 3, 1990). Consequently, the Court rejects Commerce's assertion that it was obliged to accept the scope set forth by Timken's petition.

■ Nevertheless, Commerce, as the administering agency, is entrusted to safeguard domestic industries from unfair trading practices by foreign manufacturers. 19 U.S.C. § 1673. All too often, however, foreign manufacturers effectively emasculate our dumping laws by employing inventive import strategies. Circumvention of

antidumping orders by way of establishing finishing operations in the United States has posed a particularly persistent problem for the agency.

Congress has long acknowledged the injurious potential of this situation and manifested its intent to preclude foreign importers from circumventing our trade laws. S.Rep. No. 1298, 93rd Cong., 2d Sess. 169, *reprinted in* 1974 U.S.Code Cong. & Admin.News 7186, 7306. Accordingly, Congress has attempted to thwart importers' circumvention strategies by enacting legislation intended to "send a clear message to foreign producers and trading partners that we will actively seek to prevent circumvention of our trade laws, and thereby decrease the incentive foreign producers might have to 'finesse' their way around our trade laws, in order to engage in recognized unfair trade practices." S.Rep. No. 71, 100th Cong., 1st Sess. 135 (1987). Section 1321 of the Omnibus Trade and Competitiveness Act of 1988 (OTCA) is clearly intended to provide Commerce with the discretion necessary to allow it to enforce our trade laws effectively. H.Rep. No. 40, 100th Cong., 1st Sess. 100 (1987).

■ In the case at bar, plaintiffs maintain that since what is sold in the United States is the completed TRB and not the components, they cannot be subject to the dumping laws. *Plaintiffs' Memo* at 10. Plaintiffs' argument is predicated on the mistaken premise that the TRB components are discrete from the completed bearings which *are* covered by the investigation. The imported components at issue constitute the sole input for the finished TRBs,[4] which compete with the domestic industry and, yet, are excluded from the purview of our dumping regulations by reason of a finishing operation performed in the United States.

NTN's TRB components are generally made of a steel alloy which has been sub-

---

er or cage), whether finished or unfinished. A.R. Doc. 1 at 9.
[U]nfinished components ... should also be considered within the scope of this petition for an investigation. A.R. Doc. 1 at 12.

**4.** The finished TRBs, produced at plaintiffs' Illinois plant, consist of outer rings, inner rings, retainers, seals and rollers, all of which are primarily produced in Japan. *Plaintiffs' Memo* at 9.

stantially transformed into the various parts. These prefabricated components have no independent application other than to be combined and further refined into complete TRBs.[5] This process of completion, although resulting in a distinct downstream product, does not constitute a transformation of the parts, *i.e.*, TRB component parts are *not* subsumed into a new article of commerce, they are merely further refined.

It is apparent to the Court that the situation herein exemplifies the classic circumvention schemes that hinder effective enforcement of our antidumping legislation. This Court, however, will not condone the circumvention of our dumping laws merely by the utilization of ingenious import techniques. *Gold Star Co. v. United States*, 12 CIT ——, ——, 692 F.Supp. 1382, 1385 (1988), *aff'd sub nom. Samsung Elec. Co. v. United States*, 873 F.2d 1427 (Fed.Cir. 1989). When, as in the case at bar, pre-fabricated components are imported for the exclusive purpose of finishing into a product that *would* be subject to a dumping order, thereby escaping dumping penalties, then the components are properly within the scope of the investigation and subsequent order. *Id.*

In light of Congress' expressed intent to discourage the practice of establishing finishing operations in the United States with the specific purpose of evading our trade laws and finding that to be the case herein, this Court holds that Commerce possessed discretionary authority to include plaintiffs' TRB component parts within the scope of its investigation.

### 2. Currency conversion rate

■ Additionally, plaintiffs claim that Commerce unlawfully refused to apply the "special rule" exception provided for in 19 C.F.R. § 353.56(b) (1987) to calculate the currency conversion rate applicable in its comparison of fair market value and United States price.

In the event that differing currencies are involved in a transaction under investiga-

tion, Commerce determines the conversion rate to be used for comparison of United States price and foreign market value pursuant to 19 C.F.R. § 353.56:

> (a) *Rule for conversion.* In determining the existence and amount of any difference between the United States price and the fair value or foreign market value for the purposes of this part or of the Act, any necessary conversion of a foreign currency into its equivalent in United States currency shall be made in accordance with the provisions of section 522 of the Tariff Act of 1930, as amended (31 U.S.C. 372):
>
> (1) As of the date of purchase ...; or
>
> (2) As of the date of exportation, if the exporter's sales price is an element of the comparison.

Section 522 of the Tariff Act of 1930, codified in 31 U.S.C. § 5151 (1982), prescribes that the Secretary of the Treasury shall determine the value of foreign currency changed into U.S. currency, for the quarter in which the products were exported. If, however, *inter alia* this rate varies more than five percent from the market rate on the day of export, the first buying rate for the foreign currency to be certified by the Federal Reserve Bank of New York shall be the applicable rate, provided that it doesn't vary more than five percent from the market rate on the day of export. 31 U.S.C. § 5151(b), (c), (d).

Section 353.56 of Commerce's regulations goes on to provide an exception to the currency exchange schedule set forth in section (a):

> (b) *Special rules for fair value investigations.* For purposes of fair value investigations, manufacturers, exporters, and importers concerned will be expected to act within a reasonable period of time to take into account price differences resulting from sustained changes in prevailing exchange rates. Where prices under consideration are affected by temporary exchange rate fluctuations, no differences between the prices being compared resulting solely from such ex-

---

**5.** Plaintiffs concede that the parts are manufactured for the exclusive purpose of supplying their Elgin, Illinois plant, and they are not sold as replacement parts. *Plaintiffs' Memo* at 8.

change rate fluctuations will be taken into account in fair value investigations. This exception derives from the notion that the purpose of the antidumping laws

would be ill-served by application of a mechanical formula to find LTFV sales, and thus a violation of the antidumping laws, where none existed. A finding of LTFV sales based on a margin resulting *solely* from a factor beyond the control of the exporter would be unreal, unreasonable, and unfair.

*Melamine Chem., Inc. v. United States,* 732 F.2d 924, 933 (Fed.Cir.1984) (emphasis in original).

Pursuant to the procedure outlined by 19 C.F.R. § 353.56(a) and 31 U.S.C. § 5151, the ITA used the rates certified by the Federal Reserve Bank to compare United States price and FMV of the imported merchandise. *See* 52 Fed.Reg. at 30,703. Commerce determined NTN's final less than fair value ("LTFV") dumping margin to be 36.53%. 52 Fed.Reg. at 47,956. Plaintiffs rebut, however, that "a significant portion" of the dumping margins which Commerce attributed to it were generated by a sustained increase in the value of the Japanese yen ("yen") against the United States dollar ("dollar") during the period in which the ITA investigated and compared NTN's foreign market value and United States price. Consequently, plaintiffs assert, the ITA should have applied the "special rule" clause provided in 19 C.F.R. § 353.56(b) to abrogate the alleged false margins created by sudden currency shifts. *Plaintiffs' Memo* at 25.

Between September 1985 and August 1986 (encompassing the period during which Commerce conducted its investigation in this case), the yen experienced a forty percent increase in value against the dollar. *Plaintiff's Memo* at 19. The effect of such drastic exchange rate fluctuations is, theoretically, to decrease the dollar value (*i.e.,* the United States price) of Japanese products even though the "yen" price (*i.e.,* the home market price) remains unchanged. Thus, it is feasible that after an appreciable accretion in the value of the yen against the dollar, identically priced

goods imported from Japan become lower priced in the United States than they are in the home market, thereby creating the illusion of sales at less than fair value.

"Congress has afforded Commerce considerable latitude and discretion in implementing the antidumping duty laws, especially during the investigative fair value phase." *Melamine,* 732 F.2d at 929. Similarly, the administering agency's interpretation of it's own regulation is entitled to substantial deference unless it is plainly erroneous or inconsistent with the regulation. *Mullins Coal Co. v. Director, Office of Workers' Compensation Programs, United States Dep't of Labor,* 484 U.S. 135, 159, 108 S.Ct. 427, 440, 98 L.Ed.2d 450 (1987), *reh'g denied,* 484 U.S. 1047, 108 S.Ct. 787, 98 L.Ed.2d 872 (1988).

The caselaw on this issue, although scarce, is unambiguous. The "special rule" exception was designed to provide Commerce some flexibility in the administration of the antidumping laws. Application of the exception, however, is limited to a very particular set of circumstances. These circumstances were satisfied in *Melamine* where the dollar declined, rose sharply, and then declined again, all within a three-month period covered by Commerce's investigation. 732 F.2d at 932.

Plaintiffs' attempt to liken the situation in this case to that in *Melamine* is untenable. The facts in evidence here clearly differ from those in *Melamine.* It is precisely those differences that required application of 19 C.F.R. § 353.56(b) in that instance and preclude its use in this case.

In the aforementioned case, the dumping margin created by the currency exchange rate fluctuation constituted the *entire* dumping margin, *i.e.,* no dumping margin resulted when the fluctuations were accounted for. In the instant action, on the other hand, plaintiffs have not provided the Court with any evidence that the dumping margins resulted *solely* from exchange rate shifts. "The essence of § 353.56(b) is to permit the administering authority (now Commerce) to disregard a margin of dumping when that margin is created *solely* by flexible, temporary fluctuations in the ex-

change rate of a particular foreign currency against the United States dollar." *Melamine*, 732 F.2d at 928 (emphasis in original). Hence, plaintiffs' assertion that § 353.56(b) is nonetheless applicable, must be rejected.

Yet another factor distinguishes *Melamine* from the case at bar. In sharp contrast to the currency fluctuations experienced in *Melamine*, plaintiffs here admit that the forty percent drop in the value of the dollar occurred during a one-year period. A steady decline in the value of the U.S. dollar over a period of twelve months can hardly be equated with the drastic shifts that occurred during the three-month period involved in *Melamine*.

In *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*, 10 CIT 424, 640 F.Supp. 255 (1986), this court again contemplated the proper application of § 353.56(b). There, as in the case at bar, the rate change was not a "temporary fluctuation," but rather a constant decline. *Id.* at 430, 640 F.Supp. at 260. In affirming Commerce's refusal to apply the special provision, the court reasoned on remand that "it was clearly reasonable to distinguish the facts as presented by plaintiffs from those necessary for invoking regulation 353.56(b)." *Luciano Pisoni Fabbrica*, 11 CIT 280, 287, 658 F.Supp. 902, 907 (1987), *aff'd*, 837 F.2d 465 (Fed.Cir.1988), *cert. denied*, 488 U.S. 819, 109 S.Ct. 60, 102 L.Ed.2d 38 (1988). This Court also finds Commerce's rationale for distinguishing between temporary fluctuations in exchange rates and constant movement in one direction to be patently sound. Where the currency doesn't fluctuate but instead steadily rises or falls, the importer has more ability to respond to the changes, albeit always being a step behind. The purpose of the "temporary fluctuation" provision is to provide some assurance that the importer had some control over price before accusing the importer of dumping. *Melamine*, 732 F.2d at 933.

Furthermore, because Commerce does acknowledge that a "lag" can occur between the actual market trends and an importer's ability to react to them, the "special rule" provision can be invoked if the record shows the importer's diligent attempt to adjust prices in accordance to the currency shifts. *See Luciano Pisoni Fabbrica*, 11 CIT 280, 658 F.Supp. 902. In the instant action, however, Commerce found that:

> no evidence was submitted showing price adjustments for all customers, nor were the price changes submitted reflective of the 40 percent drop of the value of the dollar against the yen during the period of investigation. Therefore, we have used the official exchange rate as noted in the "Currency Conversion" section of this notice.

52 Fed.Reg. at 30,704.

Plaintiffs, while not denying that they raised their prices only after six months and then, only partially, claim that Commerce should have accepted "NTN's good faith effort to raise prices" as sufficient to invoke application of the "special rule" provision. *Plaintiffs' Memo* at 24. Apparently, NTN discerns that a company that shows an attempt, however feeble, to raise its prices, is automatically exempt from Commerce's scrutiny.[6] The Court finds no merit in this argument.

Commerce's regulation states that in order to invoke the "special rule" exception, NTN must have "act[ed] within a reasonable period of time to take into account price differences." 19 C.F.R. § 353.56(b). The record shows that NTN *failed to act for six months* and when it did finally act, did so insufficiently. It is well within the discretion of Commerce in enforcing the antidumping laws to find that six months is an unreasonable period to allow an importer before it raises its prices in response to a currency rate change. *See Melamine*, 732 F.2d at 933 (three months reasonable); *Final Determination of Sales at Less Than Fair Value: Certain Forged Steel Crankshafts From the Federal Republic of Germany*, 52 Fed.Reg. 28,170, 28,176 (July 28, 1987) (seven months unreason-

---

**6.** Plaintiffs claim that they attempted to, but could not, raise a substantial part of their prices because they were fixed by long-term contracts set before the currency began to fluctuate.

able). Hence, the currency conversion rate applied by the ITA in the FMV comparison was in accordance with law.

### 3. Most Similar Merchandise in Foreign Market Value Calculation

 Plaintiffs contend that the ITA's methodology for selecting most similar merchandise does not satisfy the requirements prescribed by 19 U.S.C. § 1677 (1982).[7] NTN bases its objections on the following allegations: (a) the maximum individual factor deviations allowed by the ITA were too high; (b) the ITA failed to consider the commercial value of the similar merchandise in its analysis; (c) the ITA did not take into consideration differences presumably created by varying levels of trade; and (d) the ITA's selection of similar merchandise were often not in accordance with the methodology the ITA vowed to implement.

The ITA's methodology, adopted after consultation with all interested parties, considered six (6) individual physical criteria in comparing TRBs: (1) inside diameter; (2) outside diameter; (3) width; (4) type of bearing (*i.e.*, same number of rows of rollers); (5) dynamic load rating; and (6) Y factor. 52 Fed.Reg. at 30,702. The ITA chose its selections by

taking the U.S. bearing and comparing it to all bearings in the home market in which each individual criterion deviation [was] 10 percent or less. Out of that group of similar bearings, [they] then picked as most similar the home market bearing in which the criterion with the greatest degree of deviation was smaller than the criterion with the greatest de-

gree of deviation in any of the other similar bearings. [They] normally limited individual deviations to 10 percent, although where only one factor deviated, [they] allowed bearings where that factor was slightly over 10 percent.

*Id.* at 30,703.

Although plaintiffs agree that the characteristics selected by the ITA are proper for comparing TRBs, they object to the acceptable deviation formula implemented by the ITA. Rather than allowing an individual factor deviation of up to ten percent, plaintiffs maintain that the most similar merchandise would be obtained if the ITA accepted a sum total ten percent combined deviation. Plaintiffs further charge that the ITA's practice of selecting the bearing with the lowest individual factor deviation effectively disregards the other factors.

An accurate investigation requires that the merchandise used in the comparison be as similar as possible. Furthermore, as plaintiffs correctly maintain, there is a statutory preference for comparison of most similar, if not identical merchandise for the purpose of FMV calculations. *Timken Co. v. United States*, 10 CIT 86, 96, 630 F.Supp. 1327, 1336 (1986) (*"Timken I"*); *Smith–Corona Group, Consumer Prod. Div., SCM Corp. v. United States*, 713 F.2d 1568, 1578 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). Undoubtedly, the ITA's fundamental objective in an antidumping investigation is to compare the United States price of imported merchandise with the value of "such or similar merchandise" sold in the

---

**7.** 19 U.S.C. § 1677(16) provides the following three hierarchical definitions for the term "such or similar merchandise." The administering agency is instructed to apply the first category under which a satisfactory determination can be made.

　(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

　(B) Merchandise—
　(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

　(ii) like that merchandise in component material or materials and in the purposes for which used, and
　(iii) approximately equal in commercial value to that merchandise.
　(C) Merchandise—
　(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
　(ii) like that merchandise in the purposes for which used, and
　(iii) which the administering authority determines may reasonably be compared with that merchandise.

foreign market. *Timken I,* 10 CIT at 95, 630 F.Supp. at 1336.

Commerce has traditionally been granted broad discretion in the selection of methodology implemented to achieve its mandate. Hence, absent a showing of unreasonableness on the part of the agency, its choice of methodology shall be sustained. *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404–05, 636 F.Supp. 961, 966 (1986), *aff'd,* 810 F.2d 1137 (Fed.Cir.1987). Moreover, it is the administering agency rather than an interested party that should make the determination as to what methodology should be used. *Timken I,* 10 CIT at 98, 630 F.Supp. at 1338.

In the case at bar, plaintiffs have not provided any evidence of unreasonable behavior on the part of Commerce. The Commerce Department was not required to adopt the methodology advanced by plaintiffs. Furthermore the record supports Commerce's contention that its methodology was reasonable. The court will uphold Commerce's judgment absent a clear showing that it was not supported by substantial evidence. *Ceramica Regiomontana,* 10 CIT at 404, 636 F.Supp. at 965.

Next, plaintiffs maintain that Commerce further disregarded its statutory mandate by "not considering commercial value of the home market bearing" in selecting most similar merchandise. *Plaintiffs' Memo* at 28. In support of this contention, plaintiffs allude to this court's opinion on remand in *Timken Co. v. United States,* 11 CIT 786, 673 F.Supp. 495 (1987) (*"Timken II"*). Plaintiffs' reliance on that case is, however, misplaced. In *Timken II,* the issue of commercial value was remanded to Commerce because "the court [could not] determine from the record whether the agency did in fact consider commercial value." 11 CIT at 792, 673 F.Supp. at 503.

By way of contrast, Commerce in this case directly addressed the issue of commercial value and determined:

> it is not possible to measure approximate equality in terms of commercial value. One must specify a particular commercial application, using the system life formula, in order to measure the commer-

cial value of specific bearings. Therefore, we determined under section 771(16)(C) which home market products reasonably could be compared to the TRBs sold to the United States.

52 Fed.Reg. at 30,702–703. Section 771(16)(C), codified as 19 U.S.C. § 1677(16)(C), provides alternate criteria the ITA *must* use to determine "such or similar merchandise." *See supra* n. 7. It defines similar merchandise as that fitting into the first of three categories "in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made." 19 U.S.C. § 1677(16).

Commerce here was unable to determine "such or similar merchandise" pursuant to 19 U.S.C. § 1677(16)(A) or (B), and was therefore statutorily required to resort to § 1677(16)(C) to determine "such or similar merchandise." The record shows this to be precisely what Commerce did. Hence, plaintiffs' argument cannot be earnestly espoused.

With respect to plaintiffs' contention that the ITA's disregard of levels of trade differences is contrary to law, plaintiffs have not provided, nor has the court uncovered any support for this argument. To the contrary, this court has noted previously that there is no statutory mandate requiring Commerce to remain within the same levels of trade while effecting its "such or similar merchandise" determination. *Timken II,* 11 CIT at 793, 673 F.Supp. at 504. Plaintiffs, therefore, have no basis for requesting that the Court require Commerce to limit its comparisons by the level of trade in which the sales occur.

In sum, upon examination of the record evidence, the Court finds ample support for the ITA's choice of methodology. This is not an instance where the ITA has mutely and arbitrarily adopted a methodology. Instead, the record indicates that the ITA duly considered suggestions from the interested parties before adopting a methodology and provided clear, reasonable explanations for the methodology to be implemented. Accordingly, the ITA's choice of methodology and "such or similar merchandise" determination are affirmed.

■ Nevertheless, plaintiffs have provided some indication that Commerce may have substantially departed from its stated methodology. These allegations have not been addressed by Commerce either on the record or before this Court. The Court cannot review Commerce's actions without proper explanation on the record. *Toho,* 11 CIT at 167, 657 F.Supp. at 1286. Hence, this issue must be remanded to Commerce for an inquiry into whether the ITA did in fact substantially depart from its stated methodology. If Commerce finds plaintiffs' allegations to be sufficiently substantiated by the record evidence, and if such a departure significantly affected its FMV calculation, the ITA shall effect the necessary corrections.

### 4. ANBM's Depreciation Expenses

■ In calculating exporter's sales price for plaintiffs' imported TRB components, Commerce deducted manufacturing expenses including, *inter alia,* the cost of depreciation of manufacturing equipment purchased by American NTN Bearing Manufacturing Corporation ("ANBM") from NTN. Depreciation cost of the machinery (as reported for bookkeeping purposes) is generally composed of actual cost of the equipment plus the amount of profit to the parent company. Plaintiffs assert that Commerce should have subtracted the amount of intra-company profit that was included in the cost of the machines to ANBM when calculating depreciation expense. Commerce defends its failure to eliminate intra-company profits from the amount to be depreciated by stating that plaintiffs untimely filed their claim in the pre-hearing briefs.

Commerce scheduled on-site verification of plaintiffs' questionnaire responses on May 19–21, 1987 (Illinois), and on June 1–12, 1987 (Japan). *Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Judgment on the Agency Record as to Counts II Through VI of the Complaint as Supplemented* at 14 *("Plaintiffs' Reply ")*. During verification, Commerce claims it merely verified the costs *reported* by plaintiffs, not the actual costs for each aspect of the manufacturing process. This information was all that Commerce said it would verify. *Defendant's Surreply* at 3. Pre-hearing briefs were filed in July of 1987, wherein plaintiffs specifically requested Commerce to adjust the amount to be depreciated. *Id.*

That the ITA must have information concerning actual costs, as opposed to mere standard costs, in order to determine whether intra-company profits were included in the price, is established by past ITA practice. In *Cellular Mobile Telephones and Subassemblies From Japan; Final Determination of Sales at Less Than Fair Value,* the ITA noted that "[w]hen the Department uses the actual costs of production for the components, profit is not double counted. However, when transfer or market values are used [to determine profit margin], there is no basis to determine profit, if any, included in these amounts." 50 Fed.Reg. 45,447, 45,453 (Oct. 31, 1985). *Cf. Final Determinations of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany,* 54 Fed. Reg. 18,992, 19,078 (May 3, 1989). It is therefore entirely reasonable for Commerce to require actual cost figures in order to calculate intra-company profits.

Moreover, the ITA must verify all information which constitutes a basis for its final determination. 19 C.F.R. § 353.51 (1987). For that reason, if the ITA had not verified the actual cost of each aspect of NTN's costs of production, it would be precluded from adjusting ANBM's depreciation expense to reflect intra-company profits. The Court finds no indication in the questionnaire responses or elsewhere, that plaintiffs voiced a request before or during verification about the inclusion of intracompany profits in the amount to be depreciated.

The on-site verification report filed by Commerce indicates that it considered "cost of production information" for the parts sold to ANBM, which consisted of "the standard cost of the TRB part, adjusted by the variance." *Confidential Record Document 54* at 33. Commerce then com-

pared the sales prices to NTN's reported cost of production. *Id.* Verification then, consisted merely of documentation supporting the fact that the TRB components were sold at a price higher than the standard costs for the part. Commerce's verification procedures never broached the issue of what portion of NTN's depreciation expenses was actual cost versus intra-company profits.

As the record indicates that the ITA did not verify the facts necessary to make a determination as to the inclusion of intra-company profits in the amount to be depreciated, Commerce was precluded from allowing an adjustment for plaintiffs' depreciation expenses.

5. United States Direct Selling Expenses as Adjustment to ESP

■ Plaintiffs challenge the ITA's treatment of direct selling expenses as adjustments to ESP. Plaintiffs maintain that direct selling expenses are to be considered as a circumstance of sale adjustment under

19 U.S.C. § 1677b, and as such, constitute an adjustment to FMV. *Plaintiffs' Memo* at 40. Defendant instead asserts that pursuant to 19 U.S.C. § 1677a(e)(2), Commerce properly deducted indirect selling expenses, as well as certain *direct* selling expenses from ESP.

The object of an antidumping investigation is to achieve a fair comparison of the United States price and fair market value of the merchandise at issue. To accomplish this aim, both calculations are subject to adjustment. *Smith–Corona Group*, 713 F.2d at 1571–72. Where Commerce uses ESP to calculate United States price, the allowable adjustments to that figure are prescribed in 19 U.S.C. § 1677a(d) and (e).[8] Section 1677b of title 19 permits "other adjustments" to FMV for, *inter alia*, "other differences in circumstances of sales."

This court, as well as our appellate court, has had numerous occasions to analyze the proper application of direct selling expenses and have consistently concluded that direct selling expenses and have con-

---

**8.** Section 1677a of title 19 provides in pertinent part:

**(d) Adjustments to purchase price and exporter's sales price**

The purchase price and the exporter's sales price shall be adjusted by being—

(1) increased by—

(A) when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States;

(B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States;

(C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation; and

(D) the amount of any countervailing duty imposed on the merchandise under part I of this subtitle or section 1303 of this title to offset an export subsidy, and

(2) reduced by—

(A) except as provided in paragraph (1)(D), the amount, if any, included in such price, attributable to any additional costs, charges,

and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States; and

(B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the country of exportation on the exportation of the merchandise to the United States other than an export tax, duty, or other charge described in section 1677(6)(C) of this title.

**(e) Additional adjustments to exporter's sales price**

For purposes of this section, the exporter's sales price shall also be adjusted by being reduced by the amount, if any, of—

(1) commissions for selling in the United States the particular merchandise under consideration,

(2) expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise, and

(3) any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise.

sistently concluded that direct selling expenses are properly characterized as differences in circumstances of sale giving rise to an adjustment of FMV. *E.g., Consumer Prod. Div., SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033 (Fed.Cir. 1985); *Smith–Corona Group,* 713 F.2d 1568; *Timken II,* 11 CIT 786, 673 F.Supp. 495. Upon further analysis, this Court yields the same result.

Commerce's argument for deducting direct selling expenses from exporter's sales price pursuant to 19 U.S.C. § 1677a(e)(2) cannot be embraced. "Section 1677a(e)(2) has been understood to refer to *indirect,* not direct expenses." *Timken II,* 11 CIT at 802, 673 F.Supp. at 511 (emphasis in original). Moreover, under the framework espoused by Commerce, the ITA would be devoid of any statutory basis for adjusting for direct selling expenses in cases requiring the use of "purchase price" as United States price. It is highly improbable that Congress intended this inconsistent result. When the agency's interpretation of a statute is incongruous with that of Congress, the court may not sanction the agency's action. *Federal Labor Relations Auth. v. Aberdeen Proving Ground, Dep't of the Army,* 485 U.S. 409, 108 S.Ct. 1261, 1263, 99 L.Ed.2d 470 (1988).

Hence, the Court finds that Commerce erred in deducting direct selling expenses from exporter's sales price. This issue is therefore remanded to Commerce, which shall recalculate plaintiffs' dumping margin to reflect an adjustment of foreign market value for direct selling expenses.

6. Validity of the 10%–90% Test

 During its investigation, the ITA excluded sales below cost of production from its FMV determination, pursuant to 19 U.S.C. § 1677b (1982). Commerce determined that since sales below cost of production constituted over ten percent of plaintiffs' home market sales, these should be disregarded in calculating FMV. Commerce concluded its analysis at that point, never addressing the issues of whether: (1) the sales were made over an "extended period of time," or (2) the sales were at prices allowing recovery of all costs.

NTN alleges that the use by the ITA of the 10%–90% test to determine whether less than cost of production sales by plaintiffs should have been excluded from its FMV calculation, was contrary to law. Commerce argues that the 10%–90% test is a "reasonable guideline or interpretive rule, a statement of current policy, for determining whether sales have been made in substantial quantities," 52 Fed.Reg. at 30,708, and that given the determination that below cost sales were made in substantial quantities, it was permitted to disregard those sales without further inquiry.

Pursuant to 19 U.S.C. § 1677b, the ITA shall disregard sales below cost of production where the administering authority determines that sales made at less than cost of production—

(1) have been made over an extended period of time and in substantial quantities, and

(2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade.

Since the statute does not provide a specific standard for what constitutes "substantial quantities," the ITA has often used a percentage of sales below cost of production as a reference point in determining whether or not to include such sales in its FMV calculations. *See e.g. Final Determination of Sales at Less Than Fair Value; Fall–Harvested Round White Potatoes From Canada,* 48 Fed.Reg. 51,669, 51,672 (Nov. 10, 1983); *Certain Steel Wire Nails From the Republic of Korea; Antidumping: Final Determination of Sales at Less Than Fair Value and Exclusions From Final Determination,* 47 Fed.Reg. 27,392, 27,393 (June 24, 1982).

In *Timken II,* the court noted the vagueness of the term "substantial" and declared that

the ten-percent test is consistent with [congressional] intent, given the vagueness of the term "substantial"; the likelihood that usually there will not be industry characteristics sufficient to support fine distinctions between cases on the

basis of "substantiality"; and the agency's use of the ten-percent test as a benchmark only, to be applied absent indication on the facts before it that use of the percentage will not implement legislative intent.

11 CIT at 807, 673 F.Supp. at 515. The 10%–90% test, as applied to substantiality, is deemed an interpretive rule which gives a reasonable and practical interpretation to the term "substantial". *Id.* As an interpretive rule of a vague statute, the 10%–90% test is not arbitrary to the extent that it is reasonably applied. Accordingly, the Court holds that absent proof in the evidence before it that using the test would violate congressional intent, the ITA was correct in applying it.

This court has distinguished, however, between the use of such percentages for measuring substantiality, and their use for measuring periods of time and ability for cost recovery. *Timken II,* 11 CIT 786, 673 F.Supp. 495. With regard to the issue of time periods and ability to recover costs, there is scant evidence to persuade the Court that a certain percentage of sales at less than cost of production should constitute sufficient proof that such sales "have been made *over an extended period of time*" or that their cost of production could not be recovered over a reasonable time. *See Timken II,* 11 CIT at 807, 673 F.Supp. at 515 (emphasis in original).

■ "[I]t does not follow from the fact that more than ten percent of a product has been sold below cost, that those sales occurred over an 'extended period of time.'" *Id.* at 807, 673 F.Supp. at 515. The statute requires Commerce to independently determine whether sales at less than cost of production were made over an "extended period of time" and whether the sales at less than cost of production were at prices permitting recovery of costs over a reasonable period of time. Hence, Commerce cannot summarily disregard these mandates simply because it determined that at least ten percent of home market sales were at less than cost. *Toho,* 11 CIT 160, 657 F.Supp. 1280.

Therefore, the Court directs Commerce to determine whether plaintiffs' home market sales at prices below cost of production were made over an extended period of time. Commerce will also determine whether these sales were at prices which would permit recovery of all costs of production within a reasonable time. In each instance Commerce will substantiate its determination on the record so the Court can evaluate the propriety of its actions.

### 7. "Splitting" of TRB Set Prices

■ As previously stated, a TRB consists of a cup and a cone. Where cup and cone components were sold individually in the United States but only in sets in the home market, the ITA calculated separate home market cup and cone component price equivalents.

> [W]here cup and cone components were sold in the United States and only sets composed of those identical or most similar were sold in the home market, we compared the U.S. sales of cups and cones to the home market sales of sets by determining the ratio of the direct manufacturing cost of the cup and cone to that of the complete set. This ratio was applied to the home market price of the set to calculate the price equivalent in the home market.... As long as the component cup or cone is "most similar" to the merchandise exported to the United States, we conclude that it is appropriate to use it in the comparison.

52 Fed.Reg. at 30,703. Plaintiffs maintain that this method of "splitting" sets to compute price equivalents is contrary to the statutory guidelines set forth in 19 U.S.C. § 1677b for the calculation of FMV. Instead, plaintiffs assert, a constructed value should have been used as FMV. *Plaintiffs' Memo* at 46.

Analysis of 19 U.S.C. § 1677b produces no support for plaintiffs' argument. Section 1677b(a)(2) sanctions the use of constructed value *only* when the ITA determines that the foreign market value of the imported merchandise cannot be determined by sales of "such or similar" merchandise in the home market. That was

not the case here, however, since the ITA concluded that it could accurately ascertain the foreign market value of "such or similar merchandise" by determining the ratio of the direct manufacturing cost of the cup and cone and comparing it to that of the complete set.

"Nor can section 1677b(a)(1)(B) reasonably be interpreted as preventing the ITA from determining prices of home market merchandise whenever that merchandise was sold together with other merchandise for a single price." *Timken II,* 11 CIT at 794, 673 F.Supp. at 505. Section 1677b(a)(1)(B) simply states that, for the purpose of determining FMV, pretended sales are to be disregarded. Again, the circumstances herein do not establish pretended sales. There is no doubt that sales of "such or similar merchandise" occurred in the home market.

Furthermore, such interpretation would encourage importers to circumvent the antidumping laws by simply using divergent invoicing methods. It is inconceivable to this Court that Congress would have intended to enact a legislative provision that would clearly facilitate, if not promote, the circumvention of the dumping laws. Accordingly, the Court finds that the ITA was authorized to "split" unitary set prices if it determined that this method would render an accurate FMV calculation for the individual cups and cones.

### 8. Warehouse Expenses

■ In the course of Commerce's investigation, NTN claimed a circumstance of sale adjustment commensurate with certain warehousing expenses incurred in order to facilitate prompt delivery to home market customers on a "just in time" basis. *Plaintiffs' Memo* at 50. Plaintiffs maintain that the warehousing expenses were "directly related to the particular sales under consideration by the ITA," and therefore should have been allowed as a circumstance of sale adjustment to FMV. *Id.*

Commerce rejected plaintiffs' claim, reasoning that the ITA had determined the date of sale to be the date of actual delivery to home market clients (as that was the date on which all terms of the sale were finalized) and the warehousing costs were incurred prior to that date. Hence, Commerce "treated those expenses as indirect selling expenses" and they "were used only in calculating the ESP offset," consistent with their long-standing practice. 52 Fed. Reg. at 30,704.

Appropriate allowance shall be given when it is established to the satisfaction of the administering authority that any amount of difference between United States price and foreign market value is due, in whole or in part, to differences in circumstances of sale. 19 U.S.C. § 1677b(a)(4)(B). Differences in circumstances of sale for which allowances will be made are generally limited to those circumstances which bear direct relation to the sales under consideration. 19 C.F.R. § 353.15 (1987); *F.W. Myers & Co. v. United States,* 72 Cust Ct. 219, C.D. 4544, 376 F.Supp. 860 (1974).

It is by now established that freight and warehousing charges incurred in the home market may merit a circumstance of sale adjustment. *Brother Indus., Ltd. v. United States,* 3 CIT 125, 144–46, 540 F.Supp. 1341, 1359–61 (1982); *Silver Reed America, Inc. v. United States,* 7 CIT 23, 34, 581 F.Supp. 1290, 1298 (1984). Therefore, in order to effect an adjustment to FMV, the ITA must conclude that the warehousing costs were indeed directly related to the sales under consideration.

A circumstance of sale adjustment for pre-sale warehousing costs was allowed in *Asahi Chem. Indus. Co. v. United States,* 12 CIT ——, 692 F.Supp. 1376 (1988), *dismissed on reh'g,* 13 CIT ——, 727 F.Supp. 625 (1989). The *Asahi* court reasoned: "The sales under consideration were all sales in the home market during the investigative period. If the expenses considered by Treasury can be found to bear a direct relationship to these sales, they should have been allowed." 12 CIT at ——, 692 F.Supp. at 1379.

It appears from the evidence that Commerce summarily rejected plaintiffs' claim (because the warehousing costs were incurred prior to the date of the sale) without

ascertaining whether there was any direct correlation between the pre-sale warehousing costs and the sales under consideration. Plaintiffs' submissions indicate, however, that the warehousing costs were incurred solely by reason of the delivery requirements of two particular clients and that sales to these clients occurred during the time period covered by Commerce's investigation. It appears then, that the circumstances required the ITA to conduct the analysis set forth in 19 C.F.R. § 353.15, and while this Court will not attempt to substitute its judgment for that of the ITA, it nevertheless cannot sanction the agency's disregard of its own regulation.

Consequently, the Court concurs with *Asahi* that if plaintiffs can establish that the pre-sale warehousing expenses were indeed directly related to the sales under investigation, then a proper adjustment should be allowed. This issue is remanded to the ITA for determination of whether the warehousing costs were in fact directly related to the sales under consideration. If so, the ITA is directed to treat them as an appropriate circumstance of sale adjustment to FMV.

### 9. Usual Commercial Quantities

■■■ Pursuant to 19 C.F.R. § 353.20 (1987),[9] Commerce based plaintiffs' foreign market value on a weighted average of prices for sales in the home market. 52 Fed.Reg. at 30,703. NTN argues that this constitutes a substantial and unacceptable departure from the statutory directive. *Plaintiffs' Memo* at 53.

Foreign market value shall be based on the price "at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, *in the usual commercial quantities* and in the ordinary course of trade for home consumption." 19 U.S.C. § 1677b(a)(1)(A) (1982 & Supp. V 1987) (emphasis added). "Usual commercial quantities" is further

explained in 19 U.S.C. § 1677(17) (1982 & Supp. V 1987). This section provides that in instances where the merchandise in issue is sold in the market under consideration *"at different prices for different quantities,"* the term is defined as "the quantities in which such merchandise is there sold at the price or prices ... for any other quantity." *Id.* (emphasis added).

Plaintiffs herein did not provide Commerce with, nor does it purport to possess any "evidence that it charged its home market customers different prices for different set quantities." 52 Fed.Reg. at 30,-703. Instead, NTN simply argues that § 1677b "clearly contemplates that there may be more than one price for a single quantity of merchandise" and where there is "more than one price for a single quantity of merchandise, there can never be a positive correlation between price and quantity." *Plaintiffs' Memo* at 54. Plaintiffs' implausible analysis require a broad, if not extraordinary interpretation of the statute, which this Court is not prepared to adopt. It is manifest that the application of the definition provided in 19 U.S.C. § 1677(17) is conditioned upon establishing a correlation between sales at different prices for different quantities—a condition which plaintiff herein failed to meet.

Since the statute does not provide further guidance on how fair market value should be determined when the merchandise is not sold in "usual commercial quantities," it is well within Commerce's discretion to implement regulations designed to facilitate the execution of the statutory mandate, *i.e.*, to secure an accurate FMV calculation, provided the regulations are reasonable and not contrary to statutory intent. As such, the ITA practice of basing foreign market value on a weighted average of all prices charged in the home market is affirmed.

### 10. Cost of Production

■■■ As previously discussed, section 773 of the Tariff Act of 1979, codified in 19

---

**9.** 19 C.F.R. § 353.20 provides in pertinent part:
 (a) Where the prices of the sales which are being examined for a determination of foreign market value vary ..., the determination

of foreign market value normally will be based upon the weighted average of the sales prices of all merchandise used to determine foreign market value;

U.S.C. § 1677b, requires the ITA to calculate a foreign market value for the merchandise under investigation and that, for this purpose, home market sales made at "less than cost of production" be disregarded. Commerce interprets "cost of production" to include general administrative and selling expenses. Plaintiffs disagree and claim that the term applies only to "costs for materials, fabrication and factory overhead". *Plaintiffs' Memo* at 55.

Unlike many other terms employed in the statute, nowhere in the statutory framework does there appear a definition for "cost of production." Given that most other terms are defined in detail, it is highly unlikely that this ambiguity resulted by reason of congressional oversight. When, as in this instance, Congress clearly chooses to remain silent on a specific issue, the court will grant substantial deference to the ITA's interpretation of a statutory provision, as long as it is reasonable. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 286, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988).

As this court has previously determined, the ITA's interpretation is clearly in keeping with the expressed legislative concern that unless home market below cost sales are disregarded, "sales uniformly made at less than cost of production could escape the purview of the Act, and thereby cause injury to the United States industry with impunity." S.Rep. No. 1298, 93rd Cong., 2d Sess. 173, *reprinted in* 1974 U.S.Code Cong. & Admin.News 7310; *Timken II*, 11 CIT at 811, 673 F.Supp. at 518. Hence, the ITA's definition of "cost of production" is affirmed as reasonable and in conformity with the statutory mandate.

## 11. Level of Trade Adjustment

 As previously noted, throughout the administrative proceedings plaintiffs maintained that their home market sales were effectuated at three distinct levels of trade and therefore the ITA should restrict its FMV comparisons within each level. Although the agency endeavored to compare identical merchandise sold at the same commercial level of trade in both the United States market and the home market, in instances where such parity could not be achieved, the ITA "made [its] comparisons at the other level of trade and adjusted for differences in level of trade, in accordance with § 353.19 of [its] regulations." 52 Fed. Reg. at 30,701.

Plaintiffs now argue that if the ITA is not precluded from crossing over levels of trade in its FMV comparison, then it is required by regulation to make "appropriate adjustment" for level of trade differences. Notwithstanding the adjustment already effected by the ITA which plaintiffs terms "minor," NTN maintains that the agency should have also considered, *inter alia*, differences in profitability when computing the level of trade adjustment.

When FMV comparisons cannot be made at the same commercial level of trade, Commerce's regulations authorize the administrative agency to make adjustments for differences in levels of trade that affect price comparability. 19 C.F.R. § 353.19 (1987). A level of trade adjustment is generally given to allow for differences in expenses incurred in selling to the different commercial levels. Eligibility of an importer to this adjustment is, like all others, conditioned upon proving entitlement to the satisfaction of the administering agency. 19 U.S.C. § 1677b(a)(4).

In the case at bar, Commerce clearly rejected plaintiffs' allegations that their merchandise was sold at three distinct channels of trade. Referring to NTN's claim that automobile manufacturers and original equipment manufacturers constituted different levels of trade, Commerce stated: "We rejected this argument since automobiles are a type of original equipment and respondent did not demonstrate significant differences in the expenses incurred in selling to these two classes of customers." 52 Fed.Reg. at 30,701. Plaintiffs failed to establish any differences in selling expenses between sales to automobile manufacturers and original equipment manufacturers. Hence, no adjustment was warranted. The ITA is not required nor is it in the practice of considering factors such as profitability when determining

whether to allow a level of trade adjustment. *See Study of Antidumping Adjustments Methodology* 53 (1985). Therefore, the agency's decision to deny a further level of trade adjustment was reasonable and in accordance with law.

12. Warehouse Expenses: ESP Offset Pool

 Finally, plaintiffs maintain that in its final determination, the ITA unlawfully omitted home market warehouse expenses in the ESP offset pool calculation. Commerce concurs, and joins in NTN's motion that this matter be remanded to the ITA for recalculation.

It is long standing agency practice to pool indirect home market selling expenses, such as warehouse expenses, and offset them against indirect selling expenses incurred in the United States. *See* 19 C.F.R. § 353.15(c) (1987); *Timken II*, 11 CIT at 796 n. 18, 673 F.Supp. at 506; *Smith–Corona Group*, 713 F.2d at 1578. Warehouse costs are precisely the type of indirect selling expenses generally incorporated into the ESP offset pool. Consequently, if plaintiffs' claimed home market warehouse expenses were properly substantiated, they should have been included in the ESP offset pool calculation.

NTN provided the ITA with the data necessary for it to include said expenses in its ESP offset pool and the agency indicated, in the final determination, its intention to incorporate the warehousing expenses in the ESP offset pool calculation. 52 Fed.Reg. at 30,704. An inadvertent programming error, however, caused the warehouse expenses to be omitted from the ESP offset pool calculation.

The Court therefore remands this matter to the Commerce Department with instructions that it incorporate plaintiffs' home market warehouse expenses into the ESP offset pool computation in accordance with established agency practice.

### Conclusion

In summary, the Court hereby remands to the Commerce Department the following issues for recalculation in accordance with this opinion.

(1) Commerce shall determine if the ITA substantially failed to implement its stated methodology for selection of "such or similar merchandise." If such departure occurred and significantly affected its FMV calculation, the ITA shall effect the necessary corrections.

(2) Commerce shall recalculate plaintiffs' dumping margin to reflect an adjustment to FMV, rather than exporter's sales price, for direct selling expenses.

(3) In determining whether to disregard plaintiffs' home market sales at prices below cost of production, Commerce shall take into consideration whether these were made over an extended period of time and at prices which would permit recovery of all costs of production within a reasonable time.

(4) Commerce shall determine whether the warehousing costs claimed by plaintiffs were in fact directly related to the sales under consideration. If so, the ITA is directed to treat them as an appropriate circumstance of sale adjustment to FMV.

(5) Commerce shall include home market warehouse expenses in the computation of the ESP offset pool.

The remainder of Commerce's final antidumping determination is hereby affirmed in all respects. Commerce shall report the results of its remand determination to the court within forty-five days.